No. 31,917

THE STATE OF KANSAS, *Appellee*, v. J. A. BARBOUR, *Appellant*.

(46 P. 2d 841)

Opinion filed July 6, 1935.

W. E. *Archer, Walker F. Means, John L. Gernon*, all of Hiawatha, *Edward Rooney*, of Topeka, and *J. F. O'Connor*, of Big Timber, Mont., for the appellant.

*Clarence V. Beck*, attorney general, *Earl B. Swarner*, assistant attorney general, *Forrest D. Smythe*, special assistant attorney general, and *Lloyd S. Miller*, county attorney, for the appellee; *F. M. Pearl*, of Hiawatha, of counsel.

The opinion of the court was delivered by

HARVEY, J.: J. A. Barbour, an osteopathic physician, charged with the murder of W. H. Downey, undersheriff of Brown county, at Hiawatha the night of November 9, 1933, was tried and found guilty of murder in the second degree. He has appealed and complains, principally, of the refusal of the trial court to give instructions requested, and of the instructions given. Also some complaint is

made of the admission in evidence of a dying declaration, and of parts of its contents.

The story of the homicide involves the love affairs of four young people, Doctor Barbour and Mrs. Pearl Davis, a widow, with whom he was keeping company, and W. H. (Bill) Downey and his fiancée, Miss Gertrude Fordyce, and appears to have resulted from gossip respecting Downey, originating with Mrs. Davis and which she poured into the ears of Doctor Barbour, and was by him confided to some of his friends, and a part of which Mrs. Davis mentioned to Miss Fordyce. We may say that under the evidence in this case, jurors well might have concluded there was no substantial foundation in fact for any of these gossipy stories. But, whether true or false, and without regard to what prompted Mrs. Davis to tell them, in either event they were real to Doctor Barbour.

Doctor Barbour was born in Montana; is one of a respected family of nine children; his father was an able, reputable attorney for many years; he was graduated from high school there, and for four years attended the osteopathic school at Kirksville, Mo., completed the course of study there, and in 1924 settled in Hiawatha, and since then has practiced his profession there. He bore a good general reputation both in Montana and in Kansas. He was thirty-four years old at the time of the trial, and never had married. He had kept company to some extent with several of the young women in or near Hiawatha, and among these, for perhaps three years prior to the homicide, with Mrs. Pearl Davis, and exclusively with her since August, 1933. They had learned to think a great deal of each other, had talked of marriage—possibly were engaged at the time of the homicide.

Mrs. Pearl Davis, thirty-four years of age at the time of the trial, was born in Brown county and, except for two years, had lived there all her life. She married about fifteen years prior to the trial; had a daughter thirteen years of age; had been divorced from her husband six years, and since then had worked four years as a clerk in the office of the probate judge, and since January, 1933, until the homicide, worked as a clerk in the office of the county clerk.

W. H. Downey, who never had married, was thirty-three years of age at the time of his death; was the youngest of a family of seven children, who had lived at Everest, about twenty miles from Hiawatha, in Brown county, for many years. In January, 1931, he became the undersheriff of Brown county and moved to Hiawatha,

the county seat. His mother (his father being deceased) lived with and kept house for him. Their home in Hiawatha faced north on Iowa, an east-and-west street, a few blocks from the courthouse. Since coming to Hiawatha he had become acquainted with Miss Gertrude Fordyce, a young woman who has worked, and continues to work, in the office of the Farm Bureau in the courthouse at Hiawatha. They became friends and lovers, came to be much in each other's company, and were engaged to be married.

At the trial Mrs. Davis testified that about a year and a half prior to the homicide, as she was leaving the office one evening about five o'clock, Downey asked her if she cared to ride home. She said she would, and got into his car with him; that they drove west on the main highway to Fairview, about ten miles; that while returning on a side road Downey attacked her in an effort to have illicit relations with her, but was foiled in his efforts by an approaching car and her threats to get out of the car and report the incident; that soon thereafter she told Doctor Barbour what had occurred, and he said to pay no attention to it, perhaps it would not occur again; that about four months later, as she was leaving the courthouse one day at noon, Downey again asked her if she cared to ride home; she said she would, and got into his car; that they drove out near the Hiawatha Country Club, where Downey solicited her to have illicit relations with him, which she declined. She further testified to two or three occasions, much more recent, when, as she happened to meet Downey about the courthouse, and was friendly towards him, he made some improper remark or statement to her. She further testified that in August, 1933, she went to the sheriff's office to have the sheriff O. K. a bill; that the sheriff was not in, but Downey was in the smaller of the two rooms of the sheriff's office; that she went to the door of that room; that Downey jumped and grabbed her and started pushing her toward a corner; that she told him to take his hands off her, and about that time the sheriff walked in. With respect to this incident the sheriff testified this never happened. He remembered the incident of O. K.'ing the bill; that he came into the office through the small room; that Downey and Mrs. Davis were not in the small room, but were in the larger office, talking and laughing good-naturedly. It does not appear from the record that Downey ever knew Mrs. Davis charged him with any of the improprieties above mentioned, although it appears she related these stories to Doctor Barbour.

On the evening of November 3, 1933, an incident occurred which, as testified to by Mrs. Davis and as she told it to Doctor Barbour, appears to have inflamed him greatly. She testified that because of an accumulation of work in the county clerk's office and the fact that she could get extra pay for overtime, she did not quit at the regular closing time but worked on into the evening, and that she was the only one working in the courthouse that evening; that about seven o'clock she heard someone in the hall, went to the door, and saw it was W. H. Downey. He made some remark about her working late, she explained why she was doing so, he remarked that he was going to his office, which was on the next floor, for some papers, and went on; that she began to put her books away to close her work for the evening; that about the time she had done this and was ready to leave the office Downey came from the sheriff's office; that he grabbed hold of her, pushed her into the dark part of the hallway, and began taking improper liberties with her; that she remonstrated and told him another young woman who worked at the courthouse was to work extra that evening and was to go on duty at seven o'clock and was likely to walk in any minute, whereupon he desisted. With respect to this incident W. H. Downey testified that he went to his office to get some papers to be served that evening; that his brother, Joe Downey, was with him; that as they went upstairs to the floor on which was the county clerk's office a light in the hall was on and Mrs. Davis was working in the county clerk's office, the door of which was open; that they exchanged some passing remarks about her working late; that he went on to the sheriff's office upstairs, got his papers and came down in a few minutes; that Mrs. Davis was then closing her office and asked him to turn out the lights in the hall; he told her he did not know where the switch was, and she went and turned out the lights; that she pretended not to be able to find the steps in the hall, and that he took hold of her arm and assisted her. It appears there were two ways to leave the building. Mrs. Davis went one way, he and Joe the other. He says there was no impropriety or misconduct of any character on his part. Joe Downey testified that he was with W. H. Downey on that occasion and only a few feet separated from him at any time, and that there was no impropriety or misconduct on the part of anyone.

It appears Mrs. Davis told Doctor Barbour something of her version of this incident sometime that night or the next morning. He

became quite worried about it and uncertain as to what he should do, and went to his friend, Doctor Hart, a practicing physician in the city, told him about it, and asked his advice. He appears to have been in Doctor Hart's office, which was across the street from the courthouse, when W. H. Downey and Gertrude Fordyce came from the courthouse at noon to go to his car. Barbour left Doctor Hart's office, walked across the street to where they were getting into the car, and, as he testified, said: "Downey, I have something I want to say to you, and I want Gertrude to hear it." Miss Fordyce had gotten into the car and Downey was walking around to get in from the other side, they walked up to the car so she could hear, and Barbour said:

"Mr. Downey, how far did you get roughing Pearl up in the courthouse last night about seven o'clock? Mr. Downey says, 'Nothing like that happened.' I says, 'Mr. Downey, do you mean to tell me that you were not alone with Pearl Davis up in the courthouse last night?' He says, 'No.' I says, 'All right, Gertrude is here and you are here, and it isn't quite twelve o'clock yet, and Pearl is up in her office. Let's go up there and talk with Pearl, get this straightened out'; and he says, 'No'; he says, 'I don't want any more to do with the likes of you.' Those were his exact words, and he slammed the door."

Doctor Barbour said he turned and walked away, and when he got to the curb he heard footsteps behind him; he turned and saw Downey coming toward him, and that Downey said, "Are you looking for trouble?"; that he replied, "No, sir, I came over here to try to get you to leave Pearl alone." With respect to this incident Downey testified: "Doctor Barbour came out and said: 'I want to talk to you and I want Gertrude to hear this,' and he said I was petting and loving Pearl; and I said, 'No, I wasn't, Doc, no such thing,' and I tried to tell him just what took place." With respect to it Miss Fordyce testified that Doctor Barbour came up to the car and said: "Downey, I want to talk to you. . . . I want to say this so Gertie can hear it." Then he said: "What is that about your trying to pet Pearl Davis?" That Downey replied: "I don't know what you are talking about"; that Doctor Barbour said: "Pearl Davis tells me that you have been trying to pet her"; that Downey replied, "I don't know when it was"; that Doctor Barbour asked him if he wasn't up in the courthouse last night, and Downey replied, "Why, yes, I was up there and I walked down the stairs with Pearl Davis"; that Doctor Barbour then turned to Miss Fordyce and said, "Gertie, here, has been saying some things about

me and I want her to know how you have been acting"; that Doctor Barbour appeared angry, was trembling and shaking all over; that Downey said to him, "What is the matter, Barbour, are you trying to make trouble?" and Doctor Barbour replied, "No, the trouble with you is that I can go with Pearl Davis and you can't"; that Downey replied, "All I can say is who I go with and what I do isn't any of your business"; that Doctor Barbour then walked away and Downey got into the car and they drove away.

Within two or three days after this incident it appears Mrs. Davis told Miss Fordyce that Downey on some occasion at the courthouse had solicited or had attempted to have improper relations with her. This disturbed Miss Fordyce and she talked to Downey about it. He discussed the matter with her, and apparently was able to convince her there was no foundation for such a charge. About five o'clock the evening of November 9, as Downey was leaving the courthouse, he met Mrs. Davis, and as he testified, said:

"Pearl, I don't appreciate what trouble you tried to cause me. I said, 'I think that was a low, mean trick,' and she said, 'Well, that's that,' and I said, 'What's that?' or something, and she says, 'Well, I don't know anything about,' and I said, 'Pearl, the only trouble with you is you want to make that fellow think you are very popular; nobody bothered you,' and I said, 'You lie, it was nothing but a lie, and you lied.'"

About that time Gertrude came up and she and Mrs. Davis had some words, but Downey walked away.

With respect to this incident Mrs. Davis testified:

"He (Downey) said: 'Pearl, I appreciate the way you told Doctor Barbour what I did the other night.' I never answered him. I went on down on the east side of the stairs and he went around the other way, and he was talking all of the time. I didn't understand what he said when he went around the other side; there on the stairway going down to the first floor he said: 'You tell Doctor Barbour to come over and tell Gertrude that I tried to make you the other night.' I said: 'He don't have to come over and tell Gertrude, I can tell her that myself,' and he says, 'You are a dirty damn liar,' and walked in the Farm Bureau office."

After supper on the evening of November 9, W. H. Downey drove to Everest to serve some papers, and after doing so played pool with his friends for about an hour and drove back home, reaching there about midnight. His mother had not retired, although she had been lying down part of the time on the day bed. They visited a few minutes, he had taken off his coat and his pistol and the holster in which he carried it, had unlaced his shoes and started up-

stairs to bed when someone knocked at the door. It was Doctor Barbour.

That evening, after eight o'clock, Roy Shelley, who conducts a cleaning business at Hiawatha, went to Doctor Barbour's office for a treatment. The doctor said he would not have time to give the treatment as he had an appointment to go riding with Mrs. Davis at nine o'clock and was to meet her on the street south of the courthouse. Shelley was invited to go with them, and did so. The three started riding about nine o'clock in Doctor Barbour's coupé, equipped with a radio and a heater. The one seat was wide enough to accommodate all of them. Doctor Barbour drove; Mrs. Davis rode in the center. They stopped at a place where they got some beer (near-beer), three bottles of which they "spiked" with alcohol which the doctor had with him in a bottle. They drove out a few miles from town, stopped for awhile on a side road, came back to town, and drove through various streets about the city, perhaps to the country again, and back. At some time in the evening, as they drove by the doctor's office, he got out of the car and went to his office. Perhaps Shelley did so a little later. They stopped at another place and got more beer about eleven o'clock, or later. They drank as many as nine bottles of beer that evening; whether this count includes the last purchase is not clear. Several times in the course of the evening they drove by the Downey home on Iowa street. At some time during the evening Mrs. Davis told Doctor Barbour of her conversation with Downey and of what he said to her about five o'clock that evening. About midnight they drove by the Downey home and observed Downey's car in the yard, where he usually left it when he was at home. They then were traveling west. At the end of the block they turned around and drove back and stopped in front of the Downey home, the car facing east near the curb on the south side of the street. The car lights were left burning. There is a controversy in the evidence as to whether the engine was left running. The street lights on that street had been turned off at twelve o'clock; it was a few minutes after that time. Doctor Barbour got out of the car and went to the door of the Downey residence and knocked. This was just as Downey was starting to bed. What took place within the next few minutes perhaps best can be told by summarizing the testimony of the witnesses present.

W. H. Downey testified: "It was after midnight, the lights had

just gone out, Doctor Barbour said: 'Come out here, I want to see you.' I said: 'O. K., big boy,' and went out. I did not have my coat or gun on; he cursed me something awful. I said: 'Doc, we are durned fools; now you get on away; you are foolish.' He just got abusive; he was drunk. I said: 'I want you to go away . . . Doc; if you don't go away I will place you under arrest, and put a charge of drunkenness against you.' He said: 'You just try it; you can't arrest me; just try it, you son of a bitch.'" They walked on out to the car. "I said: 'Pearl, why don't you tell Doc the whole truth of this thing; it's all a bunch of foolishness.' I don't remember what answer she made. I said: 'We are all just fools. . . . I don't want any trouble with you, and at the same time I'm not afraid of you;' then he lit in and cursed Gertrude, called her all kinds of dirty names, 'damned low morally,' and stuff like that. I knocked him down then. He got up and shot me; he had the gun in his pocket; he did not reach in the side door of the car and get the gun out of the car. I just hit him once; I knocked him down; he was just like a child; didn't know how to fight; fell like a ton of brick, and laid there a little bit, slipped his hand in his pocket and shot me. The other man in the car said: 'Don't, don't do that, Doc; Doc, don't do that,' just before the shot was fired. He was not lying down when he shot; he had come up; he shot from a horizontal position; I spun on it; I saw the gun in his hand; it was too late; I was about three feet from him when he fired; he was cursing just before he shot. After he fired the shot I turned and went toward the house. He got in the car and drove away."

Roy Shelley testified: "Doctor Barbour went to the door; Downey came out; they walked toward the car; they had some conversation. I paid no attention to the conversation between them; heard Downey say something to Doctor Barbour about putting him under arrest if he didn't leave. Doctor Barbour said: 'Your girl friend has been (not distinguishable).' Downey said: 'Don't talk about her or I'll . . . (not distinguishable).' I said: 'Come on, Doc, and let's get out of here,' or something like that. Doctor said: 'I'm not afraid of you,' or something like that. Downey said: 'I am not a-scared of you, either; I want you to know that.' The doctor made no replies. Downey struck Doctor a second time; I would not say that it knocked him down, but it staggered him. Doctor was standing near the big tree when he shot. Downey was four or five feet away. I had started to get out of the car and was on the running

board, or near it on the ground, when the shot was fired. 'I did not see Doc draw the gun; did not see him get the gun out of the pocket of the car door. A short time before that I had occasion to feel in the pocket of the car door, and did not feel a gun in there at that time. I saw no gun on Downey, and he displayed none. After the shot was fired Downey walked toward the house. He said: 'I am shot.' His mother came out to meet him. Doctor Barbour walked and got in his car. After the car was started Mrs. Davis said to Doctor Barbour: 'Did you shoot him?' or something to that effect. Doctor Barbour replied: 'I guess so,' or 'I think so.'"

Mrs. Pearl Davis testified: When they stopped in front of the Downey home the engine was turned off, the lights on the car were left burning. Doctor Barbour got out, walked around in front of the car, to the door of Downey's residence; I could not hear what was said by Doctor Barbour and Downey as they walked from the house to the car. When they reached the car Doctor Barbour opened the car door and said: "Pearl is here, let's all of us talk it over"; that Downey, standing on the parking, which is higher than the pavement, stooped over, looked into the car, and said: "Pearl is telling a damned dirty lie." Doctor Barbour said: "Downey, you and Gertrude . . ." and I said: "Oh, Doc, come on." Doctor Barbour turned his head and looked into the car; Downey said: "You yellow son-of-a-bitch, I will kill you," and struck Doctor Barbour, who was then standing at the outward side of the open car door. Doctor Barbour sort of slumped down on his knees to the ground; Doctor Barbour was pulling himself up by the car door, which he was holding onto, when Downey struck him a second time. Doctor Barbour almost fell again, was trying to get up, and a blow hit him on the neck or back some place and he almost fell on his hands over into the door; and "I saw his hand come out of the pocket with the gun." He put his hand up, "and just as Downey socked him another blow the gun went off." Downey then grabbed his stomach and said: "I am shot," and started for the house. Doctor Barbour came around the front of the car, "sort of staggered around the car and held onto the fender"; she opened the left car door; he got in, but had difficulty finding the starter, and first put the car in reverse, instead of forward, but finally got started.

Doctor Barbour testified that after he parked his car in front of the Downey residence he got out of the car and went to the door and rapped; that Mr. Downey came to the door. "I asked

him if he wanted to see me, wanted to talk to me." He said, "No," and I says, "Pearl is out in the car; will you come out and talk to her?" I don't recall he said anything; he just came off of the porch there and started for the car. When he came down off the porch I said: "Mr. Downey, you got on to Pearl, insulted Pearl, tonight, called her names in the courthouse at five o'clock. Now," I says, "Mr. Downey, you have been in trouble around here two or three other times before this," and I said, "Now if you do this again Pearl and I are going to Mr. Mellenbruch" (the sheriff), and by that time we had reached the car. I told him if we took the matter up with Mr. Mellenbruch, and everyone knew it, it might cost him his job. He didn't say a word. I opened the car door so he could see Pearl and so they could talk. I says: "Mr. Downey, there is Pearl. Let's all talk this over and not have any more misunderstanding about this." Downey says: "Why Pearl is telling a God-damned dirty lie." I says: "Downey, you and Gertrude,"— and that is as far as I got—and Mrs. Davis yelled at me. She says: "Come on, Doc," and I glanced in the car at her. I remember Downey saying: "I will kill you, you yellow son of a bitch," and the last recollection I have was when I heard the sentence. I just turned my head to look at him and heard that threat. Just as I turned my head there was a feeling of sinking came over me. He struck me and I sank to my knees and remember struggling to get up, and I got another blow on the right side of my face, and that is really the last clear recollection I have. When I got that blow on the right side of my head I remember trying to struggle to my feet. I remember having hold of the door. . . . Things were hazy. I received that blow on my jaw, right here in my mouth, and I remember the sinking feeling that came over me. I remember of sinking to my feet and getting up; got hold of the car door; struggled to get up, and got another blow on the side of my face, and really that is the last clear recollection I have. The thing that brought me to was the flash of the gun, or the report of the gun. I don't have any clear recollection of even getting into the car.

Mrs. Downey testified someone came to the door and knocked; her son Bill went to the door and opened it; the caller said: "I want to see you." She did not know what reply Bill made, if any, but he went out, leaving the door open; she went to close it, and while doing so heard Bill say: "If you came here looking for trouble I will have to put you under arrest." The next thing she heard

was the report of the gun, the shot, and Bill said: "I am shot." She went to him; the man was running around the car; the car lights were on, the engine was running, the car drove away. She helped Bill into the house and had him lie down on the day bed and called a doctor, who came promptly; she also called Miss Fordyce, who came with a girl friend.

The doctor recognized Downey's injury to be serious, called an ambulance and took him to a hospital at Sabetha, where he was operated upon about 2:30 o'clock that morning. This operation disclosed the bullet entered from the front, about five inches above and an inch to the right of the navel, had taken a downward course, and had come out just above the hip bone on the left side, and in its course had passed through the stomach and the colon. Although he received good care, peritonitis developed and on the morning of November 16 W. H. Downey died as the result of the gunshot wound inflicted by Doctor Barbour.

Directly after the shooting Doctor Barbour got into his car, drove by his office, where he left his pistol, and drove to the home of the county attorney. Somewhere en route Shelley got out of the car and went home. Mrs. Davis continued with him. They reached the county attorney's home at 12:30 o'clock. Doctor Barbour went to the door and knocked and told the county attorney that he was in trouble; that he had shot Bill Downey, or thought he had shot him; that he thought Downey had been trying to pet Pearl Davis; that he had gone to Downey's home and called him out; that they had an argument about it, and that Downey had struck him in the mouth, and that he had then gone to his car, got his pistol and fired the shot. The county attorney called the sheriff, and also called his stenographer to come to his office. The sheriff picked up a newspaper man, Mr. Hill, and all of them went to the county attorney's office in the courthouse, and Shelley was sent for. A statement was taken from Shelley, perhaps also from Mrs. Davis, and Doctor Barbour. The sheriff asked Doctor Barbour who shot Downey, and the doctor replied, "I did." In explanation of the matter Doctor Barbour stated that Downey had been showing improper attentions to Pearl Davis and that he went down there that night "to have it out with him." That expression appears to have been used several times by Doctor Barbour that evening in explanation of why he went to Downey's residence and called him out. At no time that evening did Doctor Barbour speak of being struck more than once

by Downey. Answering inquiries, Doctor Barbour told the sheriff that he had left the pistol at his office, and went with the sheriff to get it.

The statement of W. H. Downey, read in evidence at the trial, was obtained in this manner: Sometime in the day of November 10 the county attorney took his stenographer and went to see Downey at the hospital, and took his statement in the form of questions and answers. Later the stenographer transcribed her notes, and on November 12 took the transcript to Downey, had him read it, and called his attention to a few words she was not sure about. He read the statement, said it was correct, and signed it. Near midnight on the evening of November 15, when peritonitis had developed so that there was no hope for his recovery, and Downey knew and realized that, and so stated not only to his doctor but to his mother and an aunt, who had come to see him, to Miss Fordyce and to his priest, he sent for his attorney, Mr. Pearl, and discussed with him his business matters in considerable detail; called his attention to an insurance policy which paid double indemnity for accidental death; told about how he wanted his mother provided for; stated that he realized he could live but a few hours. At the suggestion of Mr. Pearl he examined the statement he previously had made, said it was correct, and that he desired to make it as his dying statement. There was then written upon it: "In face of impending death, and aware of the fact that·I am fatally ill, I hereby confirm all of the above and foregoing statements. November 15, 1933, midnight"; and this he signed in the°presence of witnesses. He died about nine o'clock the next morning.

Turning to the legal questions argued. There is a general objection to the admission of this statement as a dying declaration, but it is clear from the evidence, the substance only of which has been stated, that Downey knew he could not live and confirmed the statement in the face of his impending doom. There was a sufficient showing on this point to make the statement admissible as a dying declaration. (*State v. Smith*, 103 Kan. 148, 174 Pac. 551; *Shepard v. United States*, 290 U. S. 96.) The fact that it was not originally made as a dying declaration did not prevent it from being one, when reaffirmed, or confirmed, as such, at a time when declarant was conscious he was dying. (1 R. C. L. 543; 30 C. J. 259, 260; 1 Wharton's Criminal Evidence [11th ed.] § 534.) Some of the questions and answers normally would not be proper in a dying

declaration. Some complaint is made with respect to them. Appellant is not in position to complain on this point for the reason that objections were not made thereto. Defendant's objection to the first question and answer was sustained. The court was then handed a copy of the statement with the agreement of counsel that defendant would make objections to such questions as he desired and the court would rule upon them. Counsel for defendant stated perhaps there would not be many other objections. There were in fact none. Perhaps that was because the answers to some of the questions were regarded by defendant as being favorable to him. At any rate, no error was committed by the trial court in this matter.

The real defense in this case was that defendant discharged this gun unconsciously and without intent to do so. In support of this he produced evidence that since the Thompson-McGary case (see facts stated in *State v. Thompson*, 139 Kan. 59, 29 P. 2d 1101), which occurred in that county about eighteen months prior to the homicide in this case, defendant had carried a pistol in the pocket of his car to protect himself in case of attack; that he was struck by Downey not only once, but several times, and that he was dazed and rendered semiconscious to the extent that he did not know that he had taken the gun from the pocket of his car and had fired until the flash and noise of the shot partially brought him to himself. Defendant produced expert evidence to the effect that if he carried a pistol to protect himself, and was attacked and beaten to the extent that he was dazed and rendered unconscious, but was still able to move, the fact that in his deeper subconscious mind he thought he might be attacked and had planned in such a case to use the pistol in defense, might cause him to take the pistol out of the pocket of the car and fire it without being conscious that he was doing so. On this point the court's instructions were to the effect that if defendant was so injured by the blows of Downey that he did not know what he was doing when he fired the shot he would not be guilty. No complaint is made here of these instructions. Apparently the jury did not take that view of the evidence.

Another defense relied upon was that of self-defense. In this connection the defendant requested two instructions, as follows:

"1. In view of what the court has instructed the jury concerning provoking the difficulty, the court further instructs you that if the defendant's purpose in going to the home of deceased at the time and place and under all the circumstances was in good faith to ask the deceased to stop his attentions to

Pearl Davis, and if he did nothing more than to speak peaceably and inoffensively to deceased and did not address deceased for the purpose of provoking assault upon him, the defendant, by the deceased, in order that he might have excuse for killing or assaulting deceased then his right of self-defense would not be abridged and he could not be said to have provoked the difficulty.

"2. However, if the purpose of the defendant in going to the home of the deceased was to attack him, or to provoke him to make an assault upon the defendant so that the defendant might find an excuse to slay him or assault him, then his right of self-defense would be abridged and he would be compelled to retreat to the wall and make known his intention to abandon the conflict before he would be justified to slay his assailant to prevent great bodily injury being done to himself."

The court did not give the instructions in the language set out, but did instruct the jury fully on the law of self-defense and the right or duty of one who provokes an assault. The instructions are too lengthy to set out in full. We think it was not error for the court to refuse the instructions in the language requested. There is no evidence in this case about "retreating to the wall." On behalf of the prosecution the evidence was that Downey struck defendant once and knocked him down; that he got up, took a pistol from his pocket, and shot. On the other hand, the testimony was that Downey struck defendant several times, dazed him, rendered him unconscious, or semiconscious, and being near the car door he took the pistol from the pocket of the car and fired it without knowing that he had done so, nor intending to do so. The instructions given covered the facts in this case more accurately than those requested and refused, and fully protected the rights of defendant.

The court instructed the jury with respect to first and second degree murder and with respect to each of the four degrees of manslaughter defined by our statute. Appellant complains that the court did not instruct the jury as to the crime of voluntary manslaughter under the common law. There are three answers to this: (1) In this state manslaughter is defined by statute. The common-law divisions of voluntary and involuntary manslaughter are not recognized. (2) The jury found defendant guilty of murder in the second degree. Since he was not guilty of manslaughter, errors in the instructions with respect to that offense are not important, even if they were made. (3) There was no error in the instruction as given.

A number of minor objections are made to instructions. Most of these were not complained about in the court below. We have

examined each of them, however, and find nothing substantial in them.

At the request of the county attorney the court gave an instruction as follows:

"You are instructed that it is against the laws of the state of Kansas for one not an officer of the law or a deputy under such officer, to carry on his person in a concealed manner a pistol or any other deadly weapon."

This instruction should not have been requested nor given unless there was contained within it a statement to the effect that defendant was not on trial for carrying concealed weapons in violation of law, and that the jury could consider that fact, if they found it to be a fact, only for the purpose of determining the intent of defendant, as was done in *State v. Post*, 139 Kan. 345, 30 P. 2d 1089. However, defendant did not object to this instruction when it was given, nor ask that its wording be modified, nor did he at any time in the trial court contend that the giving of the instruction was erroneous. Even in the motion and supplemental motion for a new trial, in which certain specific instructions were objected to, this one was not mentioned. Appellant now contends that under the authority of *State v. Hartsock*, 140 Kan. 428, 37 P. 2d 36, the decision of the trial court must be reversed. With this we cannot agree. In that case the point was raised in the trial court, which was not done here. Again, in that case the question of carrying the concealed weapon was one of the points strenuously argued and urged upon the jury. Here we are told the matter never was argued or referred to, otherwise than in the instruction given, and this is not controverted. Under the facts in this case the instruction could not have had much weight one way or the other. We therefore hold the instruction given was harmless error, and, further, the point not having been raised in the court below is not available to appellant here.

Finally appellant complains of the closing argument of counsel for the prosecution, too lengthy to repeat here. Counsel endeavored to impress the jury with its responsibility as distinct from that of the responsibility of the court or of counsel. The argument on the point may be characterized as forceful, but we see nothing unfair in it. It forms no ground for reversal.

We have taken care to examine not only the printed abstracts and briefs, but the transcript of the testimony, and are convinced that defendant had a fair trial and that there was a just result.

The judgment of the court below is affirmed.