No. 51,520

STATE OF KANSAS, *Appellee,* v. DONALD L. DARGATZ, *Appellant.*

(614 P.2d 430)

Opinion filed July 18, 1980.

*Martin R. Ufford,* of Wichita, argued the cause and was on the brief for the appellant.

*Beverly Dempsey,* assistant district attorney, argued the cause, and *Robert T. Stephan,* attorney general, *Vern Miller,* district attorney, and *Neal Brady,* assistant district attorney, were with her on the brief for the appellee.

The opinion of the court was delivered by

PRAGER, J.: This is a direct appeal in a criminal action in which the defendant, Donald L. Dargatz, was convicted of incitement to riot (K.S.A. 21-4105) and murder in the second degree (K.S.A. 21-3402). The facts in the case were virtually undisputed and are

as follows: Around 6:00 or 7:00 p.m. on the evening of November 17, 1978, defendant Dargatz, a white male in his mid thirties, was driving his white van in the vicinity of Jardine Junior High School in Wichita. Dargatz was accompanied by his wife, Carolyn, and his fourteen-year-old stepson, Danny Nicholson. As the van approached a group of black juveniles, one member of the group, fourteen-year-old Bruce Epps, threw a stick which struck the side of the van. Defendant turned the van around, drove over the curb, and proceeded to chase the boys with the van across the baseball field adjacent to the school. Several of the boys testified that the defendant drove the van at a speed of 30 miles per hour, almost striking Bruce Epps and missing him by only a few inches. The boys were able to escape by crossing a foot bridge covering a creek on the opposite side of the baseball field. The van stopped by the bridge. Carolyn Dargatz and Danny Nicholson got out of the van and exchanged obscenities with the boys across the creek. Then they got back in the van and returned to their home. En route, the defendant stated that he was going to get his gun and go back and scare the boys who had thrown the stick.

After arriving at home, the defendant went upstairs and got his .22-caliber automatic rifle, banana clip, and ammunition from his bedroom. He brought the rifle, clip, and ammunition downstairs and left them by the fireplace while he went to the basement to shower. After showering, he proceeded to put the loaded gun in the van between the mattress and backboard. Danny Nicholson, not to be outdone, placed a baseball bat and a butcher knife in the van. They were thus prepared for their second encounter with the group of black boys.

The three then proceeded in the van back to the Jardine Junior High School area. The black youths were still there, sitting and talking on the foot bridge. The defendant pointed the gun out the window and fired it into the air for the avowed purpose of scaring the black youths. The boys ran off. Following the second encounter, the defendant, with his wife, and Danny Nicholson, drove from the scene and proceeded to the house of Charles and Loretta Rumsey in an effort to locate a juvenile friend of Danny's, Roderick "Bo" Smith. Bo Smith was not at the Rumsey house. Danny invited the Rumseys and three juveniles who were in the Rumsey house to join them to "kick some nigger asses". The

group, including the Rumseys, responded, "Sure," and jumped into the van. At this point, the van contained eight persons. The van proceeded toward Oaklawn with the occupants still looking for Bo Smith. Dargatz informed the group that he had a gun and had previously fired it. The van drove around and eventually encountered Bo Smith walking on the sidewalk with two young men and three young girls. Danny jumped out of the van and asked the group if they wanted to fight some "niggers." This new group of six white juveniles climbed into the van, making a total of fourteen people in the van. The van was extremely noisy with almost everyone yelling, "Let's get some niggers." Defendant drove the van back to Jardine Junior High School for the third encounter which resulted in the tragic death involved in this case. During the trip, the defendant stated that it was his intention "to teach them not to throw anything at his stuff anymore." At the trial five of the young people in the van testified, in substance, that the defendant said to them, "Let's go fight some niggers."

When the van reached the Jardine Junior High School for the third time, defendant drove up over the curb and stopped the van. He said, "There they are." The defendant opened the van door on the driver's side and got out of the van. There was testimony that, at that point, defendant said, "Get the gun." The testimony differed as to who opened the side doors so that the passengers could exit the vehicle. It appears that everyone except Carolyn Dargatz got out of the van. One of the juveniles tried to hide the gun, but Bo Smith grabbed the gun and went outside. It was Bo Smith who fired the fatal bullet, killing a young black boy, Everett Ross, Jr., who had entered onto the foot bridge unaware of the previous confrontation. He was wearing a yellow jacket and riding his bicycle. Bo Smith testified that, with gun in hand, he looked in the direction of the bridge and saw some white T-shirts and what appeared to be a yellow jacket. He was excited because they were going to fight. He aimed at the bridge and fired one shot. Immediately thereafter, Bo Smith said, "I got that nigger."

As the young black juveniles were fleeing across the bridge, fourteen-year-old Everett Ross, Jr., was approaching the bridge at the same time. He had not been a part of the earlier group and had not participated in either the exchange of obscenities or the stick throwing. The other boys yelled at him to run, but his bicycle

apparently became entangled in the fence. He finally freed his bike and started to run, but was struck in the back of the head by the bullet fired by Bo Smith. Although taken to the hospital, Everett died from the bullet in his head, the only shot fired. After Bo Smith fired the shot, either Danny Nicholson or the defendant grabbed the gun from him and placed it back inside the van. One of the witnesses testified he saw Dargatz reload the gun before placing it back inside the van. Following the shooting, the defendant and Danny Nicholson and another white boy ran up to the bridge but were unable to see anyone. After he had been shot, Everett Ross fell from the bridge and into the grass. After defendant and the boys left the area, the black youths returned to the bridge, picked up Everett Ross, carried and placed him on the hood of an automobile. He was taken to the hospital, but he could not be saved.

Defendant and his group ran back to the van where Dargatz said, "Let's get out of here." They drove back to the Rumsey house where they dropped off most of the passengers. Apparently, Dargatz again attempted to return to the area of the junior high school, but did not do so because the sound of sirens could be heard. The van returned to the Rumsey home where the Rumseys and the remaining three juveniles got out. The Dargatz family then proceeded home. Defendant Dargatz was subsequently arrested and charged with felony murder (K.S.A. 21-3401) and incitement to riot (K.S.A. 21-4105). Bo Smith, who fired the fatal shot, pleaded guilty to involuntary manslaughter (K.S.A. 21-3404). Danny Nicholson pleaded guilty to incitement to riot. Dargatz was tried by a jury which returned its verdict finding defendant guilty of incitement to riot, not guilty of first-degree murder, but guilty of second-degree murder. Following his conviction, defendant Dargatz appealed to this court. We will consider each point raised on the appeal but not necessarily in the order in which the points are raised.

The defendant contends that K.S.A. 21-4105 (incitement to riot) is unconstitutionally vague, thus violating due process requirements. The defendant argues in substance that the language in 21-4105 is so vague that an ordinary person would have to guess as to the meaning of the term "urging" as used in the statute. This, he maintains, violates his First Amendment right to free speech. K.S.A. 21-4105 provides as follows:

"**21-4105. Incitement to riot.** Incitement to riot is by words or conduct *urging* others to engage in riot as defined by section 21-4104 under circumstances which produce a clear and present danger of injury to persons or property or a breach of the public peace.

"Incitement to riot is a class D felony." (Emphasis supplied.)

K.S.A. 21-4104, which defines the offense of riot, provides as follows:

"**21-4104. Riot.** Riot is any use of force or violence which produces a breach of the public peace, or any threat to use such force or violence against any person or property if accompanied by power or apparent power of immediate execution, by five (5) or more persons acting together and without authority of law.

"Riot is a class A misdemeanor."

Riot was a crime which existed at common law. A riot was commonly defined as a "tumultuous disturbance of the peace by several persons, assembled and acting with a common intent, either in executing a lawful private enterprise in a violent and turbulent manner to the terror of the people, or in executing an unlawful enterprise in a violent and turbulent manner." 77 C.J.S., Riot § 1, p. 421. Generally, the statutory definitions of "riot" are in harmony with and follow the common-law definition.

In *Koska v. Kansas City,* 123 Kan. 362, 255 Pac. 57 (1927), it is stated that the word "mob" is practically synonymous with "riot". Under K.S.A. 21-4104, to establish the charge of riot the following elements must be proved: (1) That the defendant used force or violence which resulted in a breach of the public peace; (2) that defendant acted in a group of five or more persons; and (3) that defendant acted without authority of law. In the alternative, the State must prove (1) that defendant threatened to use force or violence to produce a breach of the public peace against any person or property; (2) that such threat was accompanied by power or apparent power of immediate execution; (3) that defendant acted in a group of five or more persons; and (4) that defendant acted without authority of law. See PIK Crim. 63.04. Incitement to riot and riot are separate and distinct offenses. One may incite to riot without participating in the riot or may participate in a riot without having incited it. *Commonwealth v. Apriceno, Appellant,* 131 Pa. Super. Ct. 158, 198 A. 515 (1938); *Com. v. Safis, et al., Appellants,* 122 Pa. Super. Ct. 333, 186 A. 177 (1936).

To establish the charge of incitement to riot under K.S.A. 21-4105, the State must prove that the defendant as a member of a

group of five or more persons by words or conduct urged others to engage in a riot under circumstances which produced a clear and present danger of injury to persons or property or a breach of the public peace. See PIK Crim. 63.05. The Kansas statutory crime of incitement to riot has essentially the same elements as the common-law crime. As noted above, the defendant contends that K.S.A. 21-4105 violates due process and is unconstitutional, because the word "urging" as used in the statute is vague and uncertain when viewed in the context of the statute. The guidelines for determining the constitutionality of a statute challenged as void for vagueness were summarized in our recent decision in *State v. Norris,* 226 Kan. 90, 595 P.2d 1110 (1979). There we stated:

"The test to determine whether a criminal statute is unconstitutionally void by reason of being vague and indefinite is whether its language conveys a sufficiently definite warning as to the conduct proscribed when measured by common understanding and practice. If a statute conveys such warnings it is not void for vagueness. Conversely, a statute which either requires or forbids the doing of an act in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application is violative of due process. The underlying principle supporting this test is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be prohibited. *State v. Stauffer Communications, Inc.,* 225 Kan. at 546; *State v. Gunzelman,* 210 Kan. 481, Syl. ¶ 2, 502 P.2d 705, 58 A.L.R.3d 522 (1972). This test is consistent with that recognized by the United States Supreme Court. See, *United States v. Harriss,* 347 U.S. 612, 617, 98 L.Ed. 989, 74 S.Ct. 808 (1954).

"When considering the validity of a statute the court starts with a presumption of constitutionality; all doubts must be resolved in favor of validity of the statute, and before it can be stricken a clear showing must be made that the statute violates the constitution. *State v. Kirby,* 222 Kan. at 3-4." pp. 91-92.

Criminal statutes making incitement to riot an offense have been attacked as unconstitutionally vague in a number of jurisdictions and have consistently been held to be constitutional. In *People v. Davis,* 68 Cal. 2d 481, 67 Cal. Rptr. 547, 439 P.2d 651 (1968), the California statute proscribing incitement to riot was challenged as void for vagueness. The statute in question, Penal Code Section 404.6, prohibited one from *urging* a riot, or from *urging* others to commit acts of force or violence under circumstances creating a clear, present, and immediate danger. In upholding the constitutionality of the statute, it was held:

"It is equally clear that nothing in the statute as drawn renders it vague or overly broad or constitutes an impermissible limitation on freedom of speech, in viola-

tion of the First and Fourteenth Amendments to the United States Constitution . . . .

"Contrary to defendant's suggestion, the section does not fail to give adequate warning of what constitutes a penal offense when it provides for punishment of every person who 'urges others' to commit acts of force or violence or to burn or destroy property. 'Urge' is a word of common and ordinary usage, and the point at which the proscribed urging occurs will depend in each instance on the point at which the speaker utters the words or indulges in other conduct urging that the violent or forcible acts or the burning or destruction be done. In *Feiner v. New York* (1951) 340 U.S. 315, 317 [95 L.Ed. 295, 298, 71 S.Ct. 303], the court after describing the conduct of the accused as '*urging* that they [his Negro listeners] rise up in arms and fight for equal rights,' (italics added) affirmed a state court conviction of disorderly conduct. The conviction of disorderly conduct in *Terminiello v. Chicago* (1949) 337 U.S. 1 [93 L.Ed. 1131, 69 S.Ct. 894], cited by defendant, was reversed because the involved city ordinance as construed by the trial court in its instructions to the jury "permitted conviction of petitioner if his speech stirred people to anger, invited public dispute, or brought about a condition of unrest. A conviction resting on any of those grounds may not stand . . .' [cites omitted]. To persons of ordinary understanding, the urging of others to acts of force or violence or to burn or destroy property . . . is neither similar nor comparable to speech which merely stirs to anger, invites public dispute, or brings about a condition of unrest." pp. 484-485.

Accord, *Chapman & Pearson v. State,* 257 Ark. 415, 516 S.W.2d 598 (1974) (relying on *Davis* to uphold incitement to riot statute which prohibited the "urging" to riot).

In *Lynch v. State,* 2 Md. App. 546, 236 A.2d 45 (1967), *cert. denied* 393 U.S. 915 (1968), a conviction for incitement to riot was upheld against a challenge that it unconstitutionally infringed upon the First Amendment freedom of speech guarantees. Relying on United States Supreme Court cases, it was held that "fighting words" which would tend to create a clear and present danger of breach of peace or civil disorder did not contribute to the free flow of ideas and are therefore not protected by the First Amendment. See, *Brandenburg v. Ohio,* 395 U.S. 444, 447, 23 L.Ed.2d 430, 89 S.Ct. 1827 (1969); *Chaplinsky v. New Hampshire,* 315 U.S. 568, 86 L.Ed. 1031, 62 S.Ct. 766 (1942); *Cantwell v. Connecticut,* 310 U.S. 296, 84 L.Ed. 1213, 60 S.Ct. 900 (1940). The above-cited authorities are persuasive. The use of the term "urging" in K.S.A. 21-4105 is sufficiently definite to make known the proscribed conduct and is, therefore, constitutionally permissible. There is also no constitutional infraction involved in the prohibition of words or conduct tending to produce an immediate danger of breach of the public peace. The statute does not conflict with the First Amendment guarantees and this claim of error must fail.

Defendant also claims reversible error in the admission, over objection, of photographs of the victim. Defendant claims that these photographs were inflammatory and unnecessary to the State's case, as there was no dispute as to the identity of the victim or the manner in which he was killed. In *State v. Campbell,* 210 Kan. 265, 500 P.2d 21 (1972), the issue of gruesome photographs was raised. There it was held:

"Even where the defendant concedes the victim's death and the cause of death, it is incumbent upon the prosecution to prove as a part of its case in chief all elements of the crime charged; and photographs to prove the elements of the crime, including the fact and manner of death, and the violent nature of the death, and to corroborate the testimony of other witnesses, are relevant and admissible." p. 276.

For more recent cases see *State v. Franklin,* 221 Kan. 739, 561 P.2d 860 (1977); *State v. Villa & Villa,* 221 Kan. 653, 654, 561 P.2d 428 (1977); and *State v. Henson,* 221 Kan. 635, 646, 562 P.2d 51 (1977). Photographs are erroneously admitted when they are unduly repetitious, gruesome, and without probative value. See, *e.g., State v. Gutierrez,* 225 Kan. 393, 394, 590 P.2d 1063 (1979); *State v. Boyd,* 216 Kan. 373, 377, 532 P.2d 1064 (1975). The photographs of the victim about which defendant complains consisted of two large and one small color photographs showing the face of the victim with a knot on his forehead where the bullet was lodged and the bullet's point of entry. The photographs in this case were not unduly repetitious or gruesome and were of some probative value. There was no error in the admission of these photographs.

Defendant also objects to the introduction of an enlarged photograph of defendant's night stand. The photo showed a newspaper folded to show an article about the shooting incident. Defendant complains that the photograph was irrelevant and introduced solely to inflame the jury. There is nothing in the record to demonstrate the relevancy of this photograph to the State's case. It is not so highly prejudicial, however, that it substantially impaired defendant's rights. The admission of this photograph was harmless error under K.S.A. 60-261.

Defendant contends the trial court committed reversible error in allowing the State to elicit, on the cross-examination of defendant's psychiatric witness, evidence of defendant's prior criminal record. The circumstances giving rise to the introduction

of the prior crimes evidence are as follows: On direct examination by defense counsel, Dr. Wellshear, the psychiatrist who evaluated defendant, was asked whether Dargatz could have formed the intent to incite a riot. In response, Dr. Wellshear stated:

"It is . . . difficult for me to believe that he could . . . put together . . . a plan of action of a sort he participated in as the one that organized it and kept it going. It's not to say that he's not capable of impulsive things. *Certainly historically he's gotten himself in trouble,* I suppose, several times by impulsiveness and lack of judgment. But the only way that I might picture that would be that it perhaps is possible only in the sense that most of the people who were in the van were children or adolescents." (Emphasis supplied.)

Out of the hearing of the jury, Dr. Wellshear stated that the trouble he was referring to, and which was considered in formulating his opinion of lack of intent, was the prior crimes information which he had received from defendant's mother. The trial court concluded that defendant's prior criminal behavior had been brought out during the direct examination, and was within the scope of cross-examination. The court also concluded that the prior crimes evidence was relevant to show intent, or ability to form criminal intent, under K.S.A. 60-455. On cross-examination, Dr. Wellshear stated that he had taken into account defendant's past criminal record in forming his opinion about defendant's intent, and that those crimes included the felonies of welfare fraud, giving a worthless check, burglary, and theft. Defendant claims this testimony was prejudicial and erroneously admitted into evidence.

Defendant's point is well taken that the prior crimes evidence was improperly admitted into evidence under K.S.A. 60-455. That statute precludes the admission of prior crimes evidence tending to show the accused's propensity for crime, but allows such evidence to be introduced to establish any one of the enumerated elements, if relevant, including intent. While such evidence is generally admissible to show specific intent, there is the additional requirement of similarity of offenses. *State v. Wasinger,* 220 Kan. 599, 602, 556 P.2d 189 (1976); *State v. Faulkner,* 220 Kan. 153, 157, 551 P.2d 1247 (1976). In the case at bar, there is clearly no similarity between the offenses of welfare fraud, passing a bad check, burglary or theft, and inciting a riot. The inadmissibility under 60-455 does not, however, render the evidence inadmissible for all purposes, as defendant contends. *State*

*v. Mitchell,* 220 Kan. 700, 703, 556 P.2d 874 (1976). K.S.A. 60-458 states that when an expert witness has given an opinion without specifying the data upon which the opinion is based, the underlying data is a proper subject of cross-examination. See *Chandler v. Neosho Memorial Hospital,* 223 Kan. 1, 6, 574 P.2d 136 (1977); *State v. Pyle,* 216 Kan. 423, 442, 532 P.2d 1309 (1975). Furthermore, once an issue is raised on direct, the "door is open," and "the cross-examination may go into any phase thereof and may extend to the entire subject matter; it is not restricted to the identical details developed on direct examination or the specific facts testified to in chief." *State v. Shultz,* 225 Kan. 135, 137, 587 P.2d 901 (1978); *State v. Stephenson,* 217 Kan. 169, 172, 535 P.2d 940 (1975); *State v. Morris,* 208 Kan. 464, 467, 493 P.2d 274 (1972); *Frame, Administrator v. Bauman,* 202 Kan. 461, 465, 449 P.2d 525 (1969). The trial court did not err in allowing the prosecution to cross-examine Dr. Wellshear relative to defendant's prior crimes which were referred to in the witness's direct examination and which were, in part, a basis for the doctor's opinion as to the defendant's intent.

Defendant contends the trial court erred in refusing to allow him to assert the defense of diminished mental capacity. Defendant argues that the evidence elicited from Dr. Wellshear that he was of low-normal intelligence and lacked leadership qualities set the foundation for Wellshear's opinion that defendant lacked the mental capacity to incite a riot. The parties dispute whether or not incitement to riot, K.S.A. 21-4105 is a specific or general intent crime. Authorities in other states hold that an element of the statutory crime of incitement to riot is the specific intent to incite the riot. *State v. Beasley,* 317 So. 2d 750, 753 (Fla. 1975); *Commonwealth v. Egan,* 113 Pa. Super. Ct. 375, 381-382, 173 A. 764 (1934) (to be guilty of incitement to riot, it must be proved that the accused spoke with the intent to provoke a riot or with a reckless or willful disregard of the probable outcome); 77 C.J.S., Riot § 2. The rationale was explained in Vernon's Kansas Crim. C. § 21-4105 (1971):

"Incitement to disorder involves a *specific intent* that disorder ensue. The speaker, to be an inciter, must have some 'enthusiasm for the result.' A notion of accidental incitement seems self-contradictory. Usually one only incites his supporters. He makes his audience part of his plan." p. 206. (Emphasis supplied.)

Defendant suggests that, because incitement to riot its a spe-

cific intent crime, this court should, as other jurisdictions have done, adopt the doctrine of diminished mental capacity. The doctrine of diminished or reduced mental capacity has been rejected by most jurisdictions on the rationale that insanity is an "all or nothing" proposition. Other states, although rejecting the doctrine, allow introduction of evidence of a defendant's abnormal mental condition for the purpose of rebutting the specific intent element of the crime. An excellent discussion of the issue can be found at 22 A.L.R.3d 1228, Mental and Emotional Condition as Diminishing Responsibility for Crime. The doctrine of diminished mental capacity, while never specifically rejected by this court, is inconsistent with the law of this state and we decline to adopt it. In *People v. Goedecke*, 65 Cal. 2d 850, 56 Cal. Rptr. 625, 423 P.2d 777, 22 A.L.R.3d 1213 (1967), it was acknowledged that the defense of diminished mental capacity "ameliorates" the *M'Naughten* test for insanity. This court has steadfastly adhered to the *M'Naughten* test for insanity. *State v. Levier,* 226 Kan. 461, 465, 601 P.2d 1116 (1979); *State v. Sandstrom,* 225 Kan. 717, 731, 595 P.2d 324 (1979); *State v. Sanders,* 225 Kan. 147, 155, 587 P.2d 893 (1978); *State v. Smith,* 223 Kan. 203, 574 P.2d 548 (1977).

In this case, the evidence of defendant's diminished mental capacity was admitted by the trial court solely on the issue of the defendant's specific intent to incite a riot. We find no error in the court's ruling. Although a mental illness or defect not amounting to legal insanity is not a defense, since, for purposes of the capacity to commit crime, degrees of mental abnormality are not recognized, where the crime charged requires a specific intent, evidence of a mental defect which negates the specific intent is admissible. See, for example, *State v. Barbour,* 142 Kan. 200, 46 P.2d 841 (1935), where evidence that defendant had received blows on the head was admitted to show defendant was dazed to the extent he did not realize he fired a pistol.

The defendant challenges his conviction of murder in the second degree on the basis that a conviction of second-degree murder is improper where the charge is felony murder and where the jury finds that the defendant is guilty of the underlying felony. Defendant further challenges the propriety of giving an instruction on murder in the second degree. The State, in rebuttal, argues that the second-degree murder conviction was entirely consistent with the evidence and was appropriate under the

State's aiding and abetting theory on which proper instructions were given to the jury. We agree with the State's position. Although the jury found the defendant guilty of incitement to riot, it may have concluded from the evidence that the act of incitement had ceased at the time Bo Smith fired the fatal shot. The evidence was sufficient to justify a conviction of Bo Smith for second-degree murder under the circumstances of the case. The jury could have concluded from the evidence that, with gun in hand, Bo Smith looked in the direction of the bridge and saw some of the black boys wearing white T-shirts and one wearing what appeared to be a yellow jacket. Taking deliberate aim at the bridge, he took one shot and immediately thereafter said, "I got that nigger." This evidence was sufficient to establish that the shooting of Everett Ross was committed with malice.

Malice as it relates to murder means knowledge of such circumstances that according to common experience there is a plain and strong likelihood that death will follow the contemplated act. *State v. Sparks,* 217 Kan. 204, 209, 535 P.2d 901 (1975). The existence of malice may be inferred from the circumstances attending the assault, such as the use of a deadly weapon, the character of the assault made, or an unprovoked or deliberately committed attack. *State v. Donahue,* 197 Kan. 317, 416 P.2d 287 (1966). In a prosecution for murder, the term maliciously has been defined as willfully doing a wrongful act without just cause or excuse. See PIK Crim. 56.04, Homicide Definitions. From the factual circumstances, the jury could have concluded that the homicide was committed maliciously by Bo Smith, that is, as a result of the willful doing of a wrongful act without just cause or excuse.

If the jury could have found Smith guilty of murder in the second degree, it could likewise find defendant Dargatz guilty of that same offense as an aider and abettor. All of the occupants of the van were there to help the defendant get revenge for the throwing of a stick at his van. It was the defendant who drove the van to the fatal scene. It was the defendant who placed his rifle in the van. It was the defendant who was the first person out of the van and who stated, "Get the gun." On this evidence, the jury properly found the defendant guilty of aiding and abetting the crime of murder in the second degree. We should also note that defendant specifically requested an instruction on murder in the

second degree. Apparently, defense counsel at the time of the trial, having heard the evidence, concluded that an instruction on murder in the second degree as a lesser offense was required in the case. We find no error either in the giving of the instruction on murder in the second degree or in the verdict of the jury finding the defendant guilty of that offense as an aider and abettor.

Finally, the defendant contends that the trial court committed prejudicial error in precluding defense counsel from cross-examining Bo Smith on his state of mind at the time he fired the fatal weapon, yet permitting the State to present rebuttal testimony to show Smith's state of mind. The record discloses that Bo Smith, called by the State, took the stand and testified in detail as to the circumstances of the shooting. He stated in substance on cross-examination that he fired the gun "because somebody told him to scare them." He then testified that he did not hear the defendant Dargatz say anything or do anything on the evening that made him (Smith) fire the gun. He fired the gun because he was excited and somebody said, "Scare them." After the State had rested and during the presentation of the defense, counsel for the defendant recalled Bo Smith to the stand. Smith was asked about previous troubles with black persons and the prosecuting attorney objected on the ground that such testimony was irrelevant. Smith was questioned outside the presence of the jury, testifying that he had previously been involved in altercations with blacks and once had been shot at by blacks. The court asked defense counsel to tie these previous experiences in with the shooting incident then before the court. Counsel then asked Smith what his purpose had been in firing the gun, and Smith said somebody said to scare them. He was asked who told him to "scare them" and he stated that he did not know. The court then sustained the State's objection to defense counsel's question as being irrelevant. As noted above, defense counsel was permitted to obtain from Smith the testimony that nothing the defendant said or did caused Smith to fire the shot. After the defense had rested, the State was permitted to reopen the case and offer the testimony of police detective Richard Vinroe, and assistant district attorney Chuck Millsap. Vinroe stated that, upon initially questioning Smith, Smith stated that he had been caught up in the excitement and had not been thinking clearly when he fired the gun. Millsap testified that upon questioning Smith, Smith told him that he had

fired the weapon because he was excited and someone told him to scare them. These statements, taken after Smith was apprehended, were essentially identical with Smith's testimony presented before the jury and in no way added to that testimony.

We have concluded that, although the trial court was unduly restrictive in the defense's cross-examination of Bo Smith, we cannot see how the exclusion of the testimony could have prejudiced defendant. The virtually undisputed evidence was that it was defendant Dargatz who set up the confrontation, provided the fatal weapon, and instructed the occupants of the van to get the gun at the scene. We, likewise, find that permitting the State to present the rebuttal testimony complained of could not have affected the outcome of the case. The evidence clearly established that there was ill will and hatred between the white people and the black youths at the time the shooting occurred. Bo Smith's ill will toward blacks was undisputed under the evidence. Under all the circumstances, any undue restriction on defense counsel's cross-examination in regard to Bo Smith's mental state and the introduction of rebuttal testimony by the State (which was in complete accord with Bo Smith's testimony on the witness stand) could not have affected the outcome of the case and hence does not constitute reversible error.

For the reasons set forth above, the judgment of the district court is affirmed.