CHARLES CONLEY LYNCH, JOSEPH CARROLL
AND RICHARD BERRY NORTON *v.*
STATE OF MARYLAND

[No. 329, Initial Term, 1967.]

*Decided December 6, 1967.*

The cause was argued before ANDERSON, MORTON, ORTH, and THOMPSON, JJ.

*J. B. Stoner* for appellants.

*S. Leonard Rottman, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Charles E. Moylan, Jr., State's Attorney for Baltimore City,* and *Frank A. De-Costa, Jr., Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

ANDERSON, J., delivered the opinion of the Court.

Appellants, Charles Conley Lynch, Joseph Carroll and Richard Berry Norton, were tried in the Criminal Court of Baltimore by a jury, Judge J. Gilbert Prendergast presiding, under two indictments. Indictment Number 3700 charged the defendants in count one with inciting a riot, in count two with riot, in count three with using profanity on a public street, in count four with disorderly conduct in a public resort, and in count five with violation of Rule Number One of the Park Rules of Baltimore City (disorderly conduct in the park). Indictment Number 3703 charged the defendants with conspiring to incite a riot in count one, and conspiring with other persons unknown to riot in count two.

Appellants were convicted under the first, fourth and fifth counts of Indictment Number 3700, and under the first count of Indictment Number 3703. Motions for new trials were denied, and appellants Lynch and Norton under the first count of Number 3700 and the first count of Number 3703 each was given concurrent sentences of two years in the House of Correction and, in addition, a fine of one thousand dollars ($1,-000.00). Under counts four and five of Indictment Number 3700, Lynch and Norton each was given concurrent sentences of thirty days in the House of Correction and a fine of fifty dollars ($50.00), also to run concurrently with the other sentences. Lynch and Norton, therefore, were given a total of two years in the House of Correction and, in addition, a fine of one thousand dollars ($1,000.00) each.

Appellant Carroll under the first counts of Indictments Number 3700 and 3703 was given concurrent sentences of not more than two years in the Maryland Correctional Institution and

no fine. Under counts four and five of Indictment Number 3700 he was given sentences of thirty days each, to run concurrently with the sentences previously imposed under the first counts of Indictment Numbers 3700 and 3703 and a fine of fifty dollars ($50.00), which was suspended.

The indictments arose out of a series of three public meetings in Patterson Park, in Baltimore City, that were held on the 25th, 27th and 28th of July, 1966. The three appellants participated in the rallies held by The National States Rights Party in Patterson Park on the three evenings in question, although the permits were issued for "The Citizens of Brailsford Committee" to conduct political rallies in Patterson Park on those dates. At no time was the Park Superintendent advised that the National States Rights Party desired to hold rallies in Patterson Park, nor was there any evidence that the citizens for Brailsford Committee participated in any of the rallies actually held, nor was Brailsford's name ever mentioned. Moreover, each of the speakers, and the literature disseminated on these occasions, referred only to The National States Rights Party as the sponsoring organization.

Each of the appellants spoke on the evenings of July 25th, July 27th and July 28th, 1966. Their speeches were given over a voice amplified system which was wired to a sound truck. Throughout the course of the rallies on the nights in question their speeches were laced with offensive epithets directed towards Negroes, Jews and certain political institutions and officeholders. Some of the remarks made during the course of the rallies were as follows:

On July 25th, Joseph Carroll said:

> "The time has come for all white youths to unite and fight for white power. Let's smash this nigger revolution here and now." * * * "I guarantee you we are the loudest bunch of hate mongers in the entire State." * * *
> "Are we going to let these vile black beasts to run wild, pillage, rape our white people? The time has come for us to fight and that is exactly what we are going to do. How about you?"

Richard Berry Norton was the second speaker. Among other things, he said:

"Connie Lynch on the subject of violence is a moderate. I know he is a moderate. Connie Lynch personally told me he favors just enough moderate violence to get the niggers the hell out of America."

The final speaker was Charles Conley Lynch who repeated epithets directed against the Negro and Jewish minorities, the Federal Bureau of Investigation, governmental leaders and the United States Supreme Court. Among other things, he said:

"Let me tell you, let me remind all of you niggers and you nigger lovers, whatever you be, whether you be politicians and what have you, you're just beginning to see and hear a little bit of what you're going to see and hear in the very near future—and you can be sure of that. Niggers are going to be hanged. More than ever been hanged before in any country or in any nation in all the world."

Later, he said:

"Certainly I believe in violence." * * * "Anybody ask you to believe in non-violence to defend what you believe is right you tell him 'Hell, yes you believe in violence'. * * * How you folk feel about it?" * * * "We are going to kill all the niggers if it takes that to keep us white. How do you folks feel about that?"

On the 27th, each speaker repeated the themes advanced on the 25th. Joseph Carroll said:

"Most of these nigger lovers are sick in the mind. * * * they should be bound, hung and killed." "* * * if they want violence we'll give it to them. White man, that is the time to get your gun and kill your share of niggers * * * we'll never, never have any racial peace and there can be no peace until the nigger hangs from every lamppost." "White man fight."

552

Richard Berry Norton said:

"I know when they [C.O.R.E.] open up you white folks are going to beat the hell out of them."

Charles Conley Lynch said:

"Rise up and unite white man and fight."

At the meeting on July 28th, Joseph Carroll said:

"The white people aren't going to tolerate any more of this, they are going to riot. There is only one way." * * * "I want you to watch me. Raise your right fist and shake it. White man, fight."

Richard Berry Norton said:

"Are you ready to fight?"

Charles Conley Lynch said:

"I know you are enthused with fight."

The above excerpts are only a small portion of what was said, and the appellants' speeches on each of the three evenings were so inflammatory, insulting and offensive as to have a direct tendency to cause acts of violence by those listening. Each evening the crowd grew in numbers, and on July 28th, by some estimates, reached as many as three thousand. Fearing serious trouble, Mr. Myerly, the Park Commissioner, on July 28th cancelled the permit because of violations of Park rules committed on the two previous nights. However, the appellants parked their sound truck adjacent to Patterson Park on the evening of July 28th and each of the apellants delivered speeches consisting of a repetition of those given on the two previous evenings.

During the course of the three evenings involved, there were a number of incidents. Because of the temperament of the crowd, it was necessary for the police to assist members of C.O.R.E. and a group called Sparticus away from the scene of the meetings. On the evening of the 28th, part of the crowd listening to the speeches, having been incited by them, began chasing two Negro boys who were merely passing through the park.

Also, on the evening of the 28th, an incident took place in the 200 block of Montford Avenue about two blocks north of Baltimore Street and one block from where Luzerne Street meets Patterson Park. Another incident on the 28th took place near the swimming pool and basketball courts in Patterson Park. This involved a number of people who had been at the rally and had run in that direction. Still another incident involved one Dennis Alexander, a 16 year old Negro youth, who was walking his dog near Patterson Park. He was beaten by a group of white boys and a rope put around his neck. The boys, who inflicted the beating, came from Patterson Park.

At each of the rallies tape recordings of the speeches were made. These tapes were admitted into evidence and were played for the court and jury. Also, photographs were taken on the evenings of the rallies in and near Patterson Park and were admitted into evidence. In addition, moving pictures, taken by a television newsman, were admitted in evidence.

## I

Appellants first contend that the court committed reversible error in permitting the State to introduce State's Exhibits Numbers 7A, 7B and 7C, same being the tape recordings of appellants' meetings on the 25th, 27th and 28th of July, 1966. Their sole argument as to this contention is that the tape recordings were too garbled to corroborate the testimony of any of the State's witnesses or give the jury a true report of what appellants said at the three meetings. We find no merit in this contention. The quality of the reproduction of the tape recordings would go to the weight of the evidence rather than its admissibility. While it is true that certain parts of the recordings were inaudible, the greater portion was readily intelligible and would be admissible. A witness may testify as to so much of a conversation as he overhears notwithstanding the fact that other parts were inaudible. See Annotation, 58 A.L.R. 2d 1024, 1038. See also *United States v. Schanerman,* 150 F. 2d 941 (3 Cir. 1945).

## II

Appellants' second, third and fourth contentions may be considered together. In essence they contend that the court erred in admitting into evidence certain testimony, photographs and

motion picture film of events which did not occur at the precise location where appellants were speaking, and that they involved incidents that took place out of sight of the appellants and away from where they were actually speaking. It is clear from the testimony that all of the incidents involved occurred shortly after the time that appellants were speaking and within a few blocks of where they were speaking. Such evidence would be as much a part of the *res gestae* as what occurred in the actual presence of the appellants. *Cohen v. State,* 173 Md. 216, 195 A. 532, cert. den. 303 U. S. 660 (1937), involved charges against a union organizer of inciting a riot and for riot. The dispute involved in that case lasted several weeks, and the meetings and other incidents which allegedly constituted the criminal acts of inciting to riot took place on a number of occasions and in a number of different locations. Testimony was admitted of certain incidents where the appellant was not present at all. The Court held that such testimony was clearly within the *res gestae* and was properly admitted into evidence on the grounds that the disorders had been incited, encouraged, aided and abetted by him. See also *Wilson v. State,* 181 Md. 1, 3, 4, 26 A. 2d 770 (1942) and *Stevens v. State,* 232 Md. 33, 40, 192 A. 2d 73, cert. den. 375 U. S. 886 (1962).

Here, the testimony, photographs and motion pictures involved events in which individuals who were at the meetings at which appellants spoke and who were coming directly from such meetings were participants and are part of the *res gestae.*

### III

Appellants' fifth, sixth, eighth, ninth and tenth contentions will be considered together. These contentions, in substance, allege that the charges brought against the appellants infringe upon their constitutional right of free speech. This contention is the real thrust of appellants' appeal. Appellants argue that the court, by refusing to grant appellants' motions for judgments of acquittal at the close of all the evidence, deprived them of due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution, since they were only exercising their constitutional rights under the Fourteenth and First Amendments to the Constitution when they spoke at their three

rallies in Patterson Park in Baltimore on the 25th, 27th and 28th of July, 1966, citing *Thornhill v. Alabama,* 310 U. S. 88, 84 L. Ed. 1093, 60 S. Ct. 736. In *Thornhill v. Alabama, supra,* the United States Supreme Court held that an Alabama statute which made loitering and picketing forbidden was invalid on its face as violative of freedom of speech and of the press since the State courts, among other things, construed the statute as forbidding the publicizing of the facts concerning a labor dispute whether by printed sign, by pamphlet, by word of mouth or otherwise in the vicinity of the business involved. There the Court said:

> "The freedom of speech and of the press guaranteed by the Constitution embraces at least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment."

In its finding, the Court held that freedom of speech and of the press secured by the First Amendment against abridgment by the United States is secured to all persons by the Fourteenth Amendment against abridgment by the States.

Here, however, the facts are not like those in *Thornhill v. Alabama, supra.* The speeches of the appellants contained language and epithets of such a nature as to incite their audience to riot and were composed of derisive and fighting words which carried their remarks outside of the constitutional guarantees. Their speeches were calculated to cause the interracial disorders which resulted therefrom and were therefore not within the guarantees of free speech.

In *Chaplinsky v. New Hampshire,* 315 U. S. 568, 86 L. Ed. 1031, 62 S. Ct. 766, Chaplinsky was convicted under a State law denouncing the use of offensive words when addressed by one person to another in a public place.[1] Chaplinsky, a mem-

---

1. "No person shall address any offensive, derisive or annoying word to any other person who is lawfully in any street or other public place, nor call him by any offensive or derisive name, nor make any noise or exclamation in his presence and hearing with intent to deride, offend or annoy him, or to prevent him from pursuing his lawful business or occupation."

ber of the sect known as Jehovah's Witnesses, was distributing the literature of his sect on the streets of Rochester on a busy afternoon. Members of the local citizenry complained to the City Marshal, Bowering, that Chaplinsky was denouncing all religion as a "racket." Bowering told them that Chaplinsky was lawfully engaged and then warned Chaplinsky that the crowd was getting restless. Sometime later, a disturbance occurred and a traffic officer started with Chaplinsky for the police station, but had not placed him under arrest. On the way, they met Marshal Bowering, who had been advised that a riot was under way and was hurrying to the scene. Bowering repeated his earlier warnings to Chaplinsky, who then said to Bowering: "You are a God damned racketeer and a damned Fascist and the whole government of Rochester are Fascists or agents of Fascists." Following his conviction and affirmance by the Supreme Court of the State, his case reached the Supreme Court of the United States on appeal. In affirming his conviction, the Supreme Court held that a State could punish as a breach of the peace use of epithets such as "damned racketeer" and "damned fascists" addressed to persons or groups, because such epithets are likely to provoke the average person to retaliation. In pointing out that under the broadest scope of the language and purpose of the Fourteenth Amendment the right of free speech is not absolute at all times, the Court in its opinion said:

> "There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or "fighting" words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality."

While the Supreme Court of the United States has in nu-

merous decisions made clear that freedom of speech and freedom of the press, which are protected by the First Amendment from infringement by Congress, are among the fundamental personal rights and liberties, which are protected by the Fourteenth Amendment from invasion by State action, it has been careful to note that there are limits to the exercise of these liberties.

In *Cantwell v. Connecticut,* 310 U. S. 296, 84 L. Ed. 1213, 60 S. Ct. 900, where the defendant's conviction of the common law offense of breach of the peace was held to be violative of the Constitutional guarantees of religion, liberty and free speech under the First Amendment as embodied in the Fourteenth Amendment, the Court in its opinion took occasion to point out that the offense known as breach of the peace includes not only violent acts but words likely to produce violence in others. The Court in its opinion at page 308 said:

"No one would have the hardihood to suggest that the principle of freedom of speech sanctions incitement to riot or that religious liberty connotes the privilege to exhort others to physical attack upon those belonging to another sect. When clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the State to pervent or punish is obvious."

In *Cantwell,* the Court pointed out that the danger in these times from coercive activities of those who in the delusion of racial or religious conceit would incite violence and breaches of the peace in order to deprive others of their equal right to the exercise of their liberties is emphasized by events familiar to us all. What the Court then said in 1940 is far more important in our ever changing society of today. As so well set forth in *Cantwell,* resort to epithets or personal abuse is not in any sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under the Constitution.

In *Feiner v. New York,* 340 U. S. 315, 95 L. Ed. 295, 71 S. Ct. 303, the facts were quite similar to the facts in the instant case. There, Feiner made an inflammatory speech to a

558

mixed crowd of 75 or 80 Negroes and white people on a city street. He made derogatory remarks about President Truman, the American Legion, and local police officials. He spoke from a large wooden box on the sidewalk through a loud speaker system attached to an automobile. The police officers, who came as a result of a call, made no effort to interfere with his speech, but were first concerned with the effect of the crowd on pedestrians and vehicular traffic. At this time Feiner was speaking in a loud, high pitched voice and gave the impression that he was endeavoring to arouse the Negro people against the whites urging that they rise up in arms and fight for equal rights. The crowd which blocked the sidewalk and overflowed into the street became restless. Its feelings for and against the speaker were rising and there was at least one threat of violence. After observing the situation for sometime without interference, the police officers, in order to prevent a fight, three times requested the petitioner to get off the box and stop speaking. After his third refusal and after he had been speaking for thirty minutes, they arrested him, and he was convicted of violating Section 722 of the Penal Code of New York, which, in effect, forbids incitement of a breach of the peace, namely, disorderly conduct. His conviction was affirmed by two New York Courts on review. The United States Supreme Court sustained his conviction against a claim that it violated Feiner's right of free speech under the First and Fourteenth Amendments. In so holding, the Court found that Feiner was neither arrested nor convicted for the making, or the content of his speech, but for the reaction which it actually engendered. The Court further held that while the police cannot be used for the suppression of unpopular views, when a speaker passes the bounds of argument or persuasion and undertakes incitement to riot, the police are not powerless to prevent a breach of the peace.

In support of their contentions, appellants place great reliance upon *Terminiello v. Chicago,* 337 U. S. 1, 93 L. Ed. 1131, 69 S. Ct. 894. The case grew out of an address Terminiello delivered in Chicago under the auspicies of the Christian Veterans of America. The meeting attracted considerable public attention. The auditorium was filled to capacity with over 800 people present. Outside a crown of about 1000 persons gathered to protest against

the meeting. The police assigned to maintain order were not able to prevent several disturbances. The crowd outside was angry and turbulent. Terminiello, in his speech, condemned the conduct of the crowd outside and vigorously, if not viciously, criticized various political and radical groups whose activities he denounced as inimical to the Nation's welfare. As a result Terminiello was found guilty by a jury of disorderly conduct in violation of a city ordinance of Chicago.

His conviction was reversed by the Supreme Court on the grounds that the trial court's construction of the ordinance in its charge to the jury was so broad as to extend the ordinance into the area of protected speech under the First Amendment as applied through the Fourteenth Amendment to the States. Mr. Justice Douglas, in speaking for the majority, said:

> "The argument here has been focused on the issue of whether the content of petitioner's speech was composed of derisive, fighting words, which carried it outside the scope of the constitutional guarantees. See *Chaplinsky v. New Hampshire*, 315 U. S. 568; *Cantwell v. Connecticut*, 310 U. S. 296, 310. We do not reach that question, for there is a preliminary question that is dispositive of the case.
>
> "As we have noted, the statutory words "breach of the peace" were defined in instructions to the jury to include speech which 'stirs the public to anger, invites dispute, brings about a condition of unrest, or creates a disturbance * * *.' That construction of the ordinance is a ruling on a question of state law that is as binding on us as though the precise words had been written into the ordinance." [2]

The majority therefore in reversing never reached the actual facts presented in *Terminiello*. Since *Terminiello* was not decided on its merits, we are of the opinion that it is not binding upon us.

---

2. The ordinance as construed by the trial court "permitted conviction of petitioner if his speech stirred people to anger, invited public dispute, or brought about a condition of unrest. A conviction resting on any of these grounds may not stand."

Appellants further rely upon *Cox v. Louisiana,* 379 U. S. 536, 559, 13 L. Ed. 2d 471, 487, 85 S. Ct. 453, 476. In that case the Supreme Court reversed Cox's convictions of disturbing the peace and obstructing public passages and courthouse picketing. The Court held that the Louisiana breach of the peace statute on its face, and as construed by the State Supreme Court, is so broad as to be unconstitutionally vague under the First and Fourteenth Amendments. The Court reversed his conviction for courthouse picketing for other reasons. The facts briefly stated are that Cox addressed a group of some 2000 Negro students who were protesting segregation and the arrest and imprisonment the previous day of other Negro students who had participated in a protest against racial segregation. In his speech Cox said, in effect, that it was a protest against the illegal arrest of some of their members and that other people were allowed to picket; that they were not going to commit any violence, and if anyone spit on them they would not spit back on the person that did it. In concluding, he said:

> "All right. It's lunch time. Let's go eat. There are twelve stores we are protesting. A number of these stores have twenty counters; they accept your money from nineteen. They won't accept it from the twentieth counter. This is an act of racial discrimination. These stores are open to the public. You are members of the public. We pay taxes to the Federal Government and you who live here pay taxes to the State."

The sheriff, construing as inflammatory Cox's concluding exhortation to the students to "sit in" at lunch counters, ordered dispersal of the group, which, not being directly forthcoming, was effected by tear gas. Cox was arrested the next day and charged with violating the Louisiana breach of the peace statute.

In the majority opinion, the Court distinguished the situation here from the situation in *Feiner v. New York, supra,* and *Chaplinsky v. New Hampshire, supra,* and pointed out that nothing said in its opinion was "to be interpreted as sanctioning riotous conduct in any form or demonstrations, however peaceful their conduct or commendable their motives, which conflict

with properly drawn statutes and ordinances designed to promote law and order, protect the community against disorder, regulate traffic, safeguard legitimate interest in private and public property, or protect the the administration of justice and other essential governmental functions."

Here, the facts are vastly different. At the three meetings in Patterson Park the three appellants made inflammatory speeches against the Negroes and Jews. The meetings were advertised by handbills which announced the speakers would be the speakers of the National States Rights Party and especially discussed the Rev. Connie Lynch (appellant Lynch) and described him as America's most exciting racist speaker. The appellants spoke over loudspeakers and their speeches were fully intended to inflame their audience against Negroes and bring about the results that followed. The whole purport of their remarks was to encourage violence in their listeners. Remarks such as "white man fight," "we are going to kill all the niggers if it takes that to keep us white," "white man, that is the time to get your gun and kill your share of niggers," "we'll never, never have any racial peace and there can be no peace until the nigger hangs from every lamppost." Such remarks could only incite to violence and riot those who were listening and also those against whom their remarks were directed.

At the trial of the case appellants on numerous occasions sought to elicit testimony that in their speeches they cautioned against violence and never told those listening to go out and riot and on at least one occasion called the crowd back when it was getting out of hand. We point out, however, that the ways in which mob violence may be worked up are subtle and various. Rarely will a speaker directly urge a crowd to lay hands on a victim or class of victims. An effective and safer way is to incite mob action while pretending to deplore it.

We find from the speeches delivered by the appellants on the 25th, 27th and 28th of July, 1966 the appellants were engaged in nonprotected speech making as defined in *Chaplinsky v. New Hampshire, supra,* and *Feiner v. New York, supra.*

We therefore find appellants' contentions five, six, eight, nine and ten to be without merit.

## IV

Appellants' seventh contention (taken out of context) is that the court committed reversible error in denying appellants' motions to dismiss Indictments No. 3700 and 3703 on the grounds stated therein. They contend that the indictments in these cases "failed to state an offense under the unconstitutional common law statutes of Inciting to Riot and Conspiracy to Incite to Riot and the other offenses alleged." They further contend that the above cited indictments are too vague, indefinite and uncertain to enable appellants and their counsel to prepare a defense. In support of this contention they argue that the Fourteenth Amendment to the United States Constitution gives the appellants the benefits of the Sixth Amendment and the rest of the Federal Bill of Rights; and that the Sixth Amendment provides that the defendant in a criminal case should be informed of the nature and cause of the accusation. First, that the indictment must be sufficiently certain to enable the defendant to plead jeopardy in a subsequent indictment, and, second, sufficiently certain to enable the defendant to prepare and make his defense. Citing *United States v. Merrick,* 207 Fed. Supp. 929, 930.

We find appellants' seventh contention to be without merit. The crimes for which the appellants were indicted are all common law offenses, with the exception of the violation of the Park rule, and each indictment in its respective counts sets forth the common law offense for which the appellants were indicted in the form commonly used for such indictments. Hochheimer's Criminal Law 2d Ed. §§ 392, 397, 429, 430, 431 and 285, 286 and 287.

An indictment must be so framed as to inform the defendant of the charge against him in order that he may prepare his defense and may also protect himself against a subsequent prosecution for the same offense. *Seidman v. State,* 230 Md. 305, 312, 187 A. 2d 109. This right is guaranteed by Article 21 of the Maryland Declaration of Rights and the due process clause of the Fourteenth Amendment to the Constitution of the United States. *Pearlman v. State,* 232 Md. 251, 192 A. 2d 767.

Here, the indictments specify the time, the place, and the

acts for which appellants were criminally charged and informed appellants of the charges against them with reasonable certainty. The first two counts in Indictment No. 3700 charge the appellants with inciting a riot and riot. Each count contains a charge that there was an unlawful assembly as is necessary in such an indictment and are in substantially the same form as those upon which the conviction of the defendant in *Cohen v. State, supra,* was affirmed. The other counts are in the usual form and wording to fully acquaint appellants of the charges. Hochheimer, 2nd Ed., §§ 392, 396. In Indictment No. 3703, in which appellants are charged with conspiracy to incite a riot and conspiracy to riot, the indictment is so framed as to sufficiently inform the appellants of the charges against them. The general rule with respect to a conspiracy indictment is that it need state only the conspiracy and the object of it; the means by which it was intended to be accomplished are only matters of evidence to prove the charge. *Pearlman v. State, supra; Piracci v. State,* 207 Md. 499, 516, 115 A. 2d 262.

Appellants' further contention that the offenses charged in the indictments are common law crimes and should have been codified and are thus unconstitutional is without merit.

V

Appellants' twelfth contention is that the evidence was insufficient to sustain verdicts of guilty under Indictments Number 3700 and 3703.

This contention has no merit. When a case is tried by a jury, this Court does not weigh the evidence presented to the jury, but only determines its sufficiency to take a particular issue or the entire case to the jury. *Ramsey v. State,* 239 Md. 561, 212 A. 2d 319; *Graef v. State,* 1 Md. App. 161, 228 A. 2d 480.

In the case at bar there was ample testimony based on the events that occurred at the rallies in Patterson Park and in its vicinity on the evenings of July 25th, 27th and 28th, 1966, in which the three appellants took so active a part to take the case to the jury on the charges of inciting a riot, disturbing the public peace and violation of Rule 1 of the Board of Recreation and Parks of Baltimore City (disturbing the peace in any park) and with conspiracy to riot.

## VI

Appellants' final contention is that the sentences and fines imposed upon them constitute cruel and unusual punishment.

The crimes for which the appellants were convicted are all common law offenses save the violation of the Park rule. In the case of common law crimes, the only restrictions on sentence are that it be within the reasonable discretion of the trial judge and not cruel and unusual punishment. In the imposition of sentence, the court must not only consider the accused, but in cases of serious import, the example to others of like inclination. *Cohen v. State, supra,* at page 232. Appellants argue that they are being punished for the mere use of words. Such is not the case. When the inflammatory language of appellants is considered and the possible disastrous consequences of a race riot which could have resulted but for the prompt and effective work of the police department, the court was within its discretion in imposing the sentences it did upon the appellants. The consequences of their offenses were serious, and violations of the law such as they were found guilty of provoking and committing cannot be minimized. We find that the court acted well within its discretion. See *Carroll v. Princess Anne,* 247 Md. 126, 230 A. 2d 452.

*Judgment affirmed.*