868 A.2d 914

**John Ryan SCHLAMP**

v.

**STATE of Maryland.**

**No. 1450, Sept. Term, 2003.**

Court of Special Appeals of Maryland.

Feb. 24, 2005.

Stacy W. McCormack (Stephen E. Harris, Public Defender on the brief), Baltimore, for Appellant.

Michelle W. Cole (J. Joseph Curran, Jr., Attorney General on the brief), Baltimore, for Appellee.

Argued before MURPHY, C.J., SHARER, THIEME, RAYMOND G., Jr., Retired, Specially Assigned, JJ.

THIEME, Judge.

John Ryan Schlamp, appellant, was charged with first degree murder, common-law riot, first degree assault, and second degree assault in connection with the stabbing death of Brandon Malstrom in College Park, Maryland. On June 27, 2003, a jury in the Circuit Court for Prince George's County convicted appellant of common-law riot and second degree assault.[1] The court sentenced appellant to ten years imprisonment for the common-law riot conviction and three years imprisonment, to be served consecutively, for the second degree assault conviction.

On appeal to this Court, appellant contends that the evidence was legally insufficient to sustain his conviction for common-law riot, and that the ten-year sentence imposed for his common-law riot conviction violates the prohibition against cruel and unusual punishment. Finding no error, we affirm the judgment and verdict of the circuit court.

---

1. Appellant was acquitted of all other charges.

## Factual Background

On November 9, 2002, Brandon Malstrom, a student at the University of Maryland, College Park, was stabbed in the chest and later died of his wounds. Brandon was killed in an incident occurring at a party in College Park. The evidence failed to disclose the identity of the person who actually stabbed the victim.

Appellant and a friend of his, Quan Davis, were arrested and charged in connection with Brandon's death. The testimony pertinent to this appeal is as follows:

William Malstrom, Brandon's brother, testified that on November 2, 2002, he, Brandon, and some friends, Brandon Conheim,[2] Paul Speakman, and Matthew Mitchell, went to Dickinson Street[3] in College Park to attend a party. William Malstrom stated that there was also a party next door to the party that they were attending, and that people were "kind of milling" between the two houses. He said that, although the party was winding down, there were "a bunch of kids in the backyard making trouble," and that there were several verbal confrontations. He and Brandon left the backyard and went out to the street to leave the party. At that time, the same people who were making trouble in the backyard came out into the street. One of the people, later identified as appellant, was yelling about a cell phone and demanding that Brandon give it back to him.

William Malstrom testified that, when Brandon refused to give appellant his cell phone, appellant took a

real weak swing at [Brandon], kind of like almost pushing him (indicating) and they got tangled up, and then it was just, I, you know, I started moving toward them. And then two other . . . of [appellant's] friends started moving in, and

---

**2.** Henceforth we will refer to the victim as "Brandon" and to Brandon Conheim as "Conheim."

**3.** It is not clear from the record whether the party was on "Dickinson Street" or "Dickerson Street." The correct name of the street is in fact Dickerson Avenue.

so two of my brother's friends came in to try to like separate people.

Conheim, who had attended the party with William and Brandon Malstrom, Paul Speakman, and Matthew Mitchell, testified that when they arrived at the party they went into the backyard and came across a large group of "young adults" standing in the backyard and causing trouble with other people at the party. Conheim stated that he was trying to defuse the situation in the backyard when appellant approached him and started a verbal confrontation. Appellant appeared to be the "leader of the group." After the confrontations in the backyard, Conheim, William and Brandon, Paul Speakman, and Matthew Mitchell went out into the street and were standing in a circle. At that time, appellant and a group of "ten or so guys" were standing in a group about 10 to 15 feet away. Conheim said that appellant came over and "busted in the middle of our circle," shouting, "turn out your pockets," and "[w]ho's got my boy's cell phone?" Brandon said that they would not turn out their pockets and appellant punched Brandon in the face. In a matter of seconds, Brandon was being held in a choke hold by Robert Fournier, who had accompanied appellant to the party. Conheim said that Fournier was contributing to the melee. While William Malstrom and Conheim were trying to pry Fournier off of Brandon, Conheim glanced over and saw Quan Davis, no more than 10 feet away, "favoring his hip ... reaching for something." Conheim testified that he thought Davis had a "gun or something like that" in his pocket.

Scott Ehrlich testified that on the evening of November 9, 2002, both he and his next-door neighbor were having parties at their houses on Dickinson Avenue. Ehrlich said that there were several verbal arguments in the backyard during the party. At some point, Ehrlich went to talk to a group of about six guys, including appellant and Davis, who were being belligerent. According to Ehrlich, he asked the group of guys to leave several times. He said that he told them to take "whatever your problem is, if you could take it elsewhere, take it on the street, down the street. This is my house. I am

responsible for the people here, and I just don't want any trouble to be here." Shortly after everyone left the house and the backyard, Ehrlich went to the front of the house and saw a "scuffle, verbal argument ... between [appellant, Davis, and Fournier] and a different group of people."

Matt Swope, a friend of Ehrlich, testified that he saw a group including appellant and Davis at the party starting fights and being aggressive toward other people. He said that there was also a loud, obnoxious marine who was part of appellant's group. At some point, Swope heard Davis mention something about a "shank." Swope thought that a shank was a knife or a pick. After a couple of hours, the group finally moved from the back of the house to the front of the house. At that time, Swope saw "some words exchanged, and an altercation happened" between two groups. Swope saw appellant punch or push Brandon, "[b]ut after that ... [t]hey were all involved."

Jacob Adams testified that he accompanied appellant, Davis, Fournier, and Kenny Brock to the party. At some point, Adams became aware that there was a commotion in the house and "some guy in [Davis's] face wanting him to leave." Adams said at that time "all of us" proceeded to the backyard. While in the backyard, Davis showed Adams a knife that he had brought to the party. Adams identified Brock as a marine who had attended the party with them.

Matthew Mitchell testified that he, Brandon and William Malstrom, Paul Speakman, and Conheim left the party and were waiting on the road when appellant approached Brandon and asked him about a Nextel cell phone. Brandon said he did not know anything about a cell phone and appellant pushed him. Thereafter, a scuffle broke out and "a tall individual" grabbed Brandon from behind. At that point, another "black male individual with cornrows came, and he was involved." Mitchell also stated that the demeanor of appellant and his group that evening was "to cause trouble."

Paul Speakman testified that, when he got to the party, he noticed a lot of noise and commotion. An individual, later

identified as appellant, who was with a group of about ten other people, seemed to be taunting and confronting a lot of people at the party. After some time, he, Brandon and William Malstrom, Conheim, and Mitchell left the party and went to the street in front of the house. After they left the party, appellant approached the group, asking where his Nextel cell phone was. After Brandon said that he did not take the cell phone, appellant pushed or punched him. At that point, the "other group of males" that were with appellant "converged around" Brandon. Brandon was being restrained from behind by a tall white male and Davis was in "very close proximity" to Brandon.

Fournier testified that he went to the party with appellant, Jacob Adams, and Kenny Brock. Davis was also present at the party. Fournier did not know the people who were having the party. After the party broke up, Fournier went out to the street where he saw "a bunch of people yelling at each other, saw [appellant], [Davis], and a bunch of other people yelling at a bunch of other people . . . and they just start to like pushing and shove each other." Fournier "grabbed Brandon and held him back." While he was holding Brandon, Fournier noticed "a couple of black kids there. [Davis] was standing there." After the police arrived, Fournier saw Davis again, and Davis gave him appellant's cell phone to return to appellant.

### Discussion

#### 1.

#### *Sufficiency of the Evidence*

■■ Appellant argues that the evidence was insufficient to sustain his conviction of common-law riot because the State failed to prove the elements of the crime. At the outset, we note that the standard for reviewing the sufficiency of the evidence is "whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 313, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Smith*,

374 Md. 527, 533, 823 A.2d 664 (2003). We give "due regard to the [fact-finder's] findings of facts, its resolution of conflicting evidence, and, significantly, its opportunity to observe and assess the credibility of witnesses." *Harrison v. State,* 382 Md. 477, 488, 855 A.2d 1220 (2004) (citing *McDonald v. State,* 347 Md. 452, 474, 701 A.2d 675 (1997), *cert. denied,* 522 U.S. 1151, 118 S.Ct. 1173, 140 L.Ed.2d 182 (1998) (quoting *State v. Albrecht,* 336 Md. 475, 478, 649 A.2d 336 (1994))).

2.

## Background

Whether one may view the development of the common law either as a seamless continuity likened to streams, sometimes guided in their courses by statutory dams and canals and flowing into the bay through wide rivers, or as a topsy-turvy accretion whereby, each day, in courts across the nation, another layer is added, in this case we shall begin with some common law definitions.

The common law and its progeny in the United States recognize the increased danger of assembled groups. The conduct of one or more persons was variously proscribed by one of the three following offenses: affray, riot, and unlawful assembly.

"If two or more persons fight in a public place to the terror of the King's subjects, this constitutes an affray . . . ." Halsbury, *The Laws of England* § 919 (1909). Riot, on the other hand,

is a tumultuous disturbance of the peace by three or more persons, who assemble together, without lawful authority, with an intent mutually to assist one another against any who shall oppose them in the execution of some enterprise of a private nature, and who afterwards actually begin or execute the same in a violent and turbulent manner to the terror of the people. It is immaterial whether the enter-

prise intended was of itself lawful or unlawful, and it is sufficient if only one person was put in fear.

*Id.* at § 929.

Lewis Hochheimer, in *The Law of Crimes and Criminal Procedure* (1897), follows the common-law definition of riot, stating: "Riot is where three or more persons, assembled with intent to carry out a common purpose, execute the same, in whole or in part, in such a violent and turbulent manner as is calculated to terrify others." Common-law riot was punishable regardless of whether it involved an underlying criminal purpose. "Placing another in fear" was sufficient to constitute a riot; accomplishment of a separate crime was unnecessary. Halsbury at § 929. Clearly, the essential distinctions between an affray and a riot are that an affray requires at least two individuals engaging in a fight, whereas a riot requires at least three individuals engaging in violent or turbulent conduct.

The other common-law offense with which we must deal is unlawful assembly. At common law, this consisted of

an assembly of three or more persons with intent either to commit a crime by open force or to carry out any common purpose, lawful or unlawful, in such a manner as to give firm and courageous persons in the neighborhood of such assembly reasonable grounds to apprehend a breach of the peace in consequence of it.

Halsbury at § 922. BLACK'S LAW DICTIONARY (8th ed.2004) defines unlawful assembly as "[a] meeting of three or more persons who intend either to commit a violent crime or to carry out some act, lawful or unlawful, that will constitute a breach of the peace." Hochheimer defines unlawful assembly as "the gathering, or congregating, of three or more persons with intent to carry out a common purpose the execution of which would involve the guilt of riot." Hochheimer at § 429.

Thus, the distillate from these various definitions is that the essence of riot was the effecting of an unlawful purpose by three or more participants, whereas unlawful assembly was a complete offense even if nothing was done beyond the assembling of three or more participants. *See* Sir John Baker, *The*

*Oxford History of the Laws of England:* 1483–1558 at 591 (2003).

With these definitions in mind, we can now turn to the contemporary law on riot.

### 3.

### *Riot*

■ In *Cohen v. State,* 173 Md. 216, 221, 195 A. 532 (1937), *cert. denied,* 303 U.S. 660, 58 S.Ct. 764, 82 L.Ed. 1119 (1938), the Court of Appeals, closely following the common-law definition, explained that, for the common-law crime of riot

> it was necessary that three or more persons be unlawfully assembled to carry out a common purpose in such violent or turbulent manner as to terrify others, and assault or destruction of property may or may not be incident to the execution of the riot. The assembly must be unlawful, else there is no riot, and the unlawful assembly must be charged in the indictment.

*Id.* (citing Hochheimer, §§ 429–431). *Cohen* states that "one person can be charged with rioting, provided he is alleged to have been so engaged with at least two other persons. If known to the grand jury, they should be indicted; if unknown, it is essential that the indictment so state." *Cohen,* 173 Md. at 222, 195 A. 532. As Maryland has not codified the crime of riot, the *Cohen* definition remains in effect today.

### *a.*

### *Three or More Persons*

■ As to the requirement that one person can be charged with rioting, provided he is alleged to have been so engaged with at least two other persons, whether known or unknown, appellant's indictment for rioting states that "John Ryan Schlamp on or about the 10th day of November, two thousand and two, in Prince George's County, Maryland, together *with persons known and unknown* to the State, unlawfully, riotously and tumultuously, did assemble and gather together to disturb the peace of the said county and State." (Emphasis

added.) This first element of the crime requires three or more persons. Conheim testified that the appellant started a verbal confrontation with him and he appeared to be the leader of the group. Matt Swope testified he saw a group including the appellant being aggressive toward other people. As to the actual assault on the victim, witnesses testified that several persons from the appellant's group were involved, including the appellant himself. In the present case, the testimony of various witnesses easily established that appellant and at least four, and possibly as many as ten, of his associates were present at a party and at the confrontation with the victim.

### b.

### *Unlawfully Assembled for a Common Purpose* [4]

■ Initially, we note that riot may be considered a species of criminal conspiracy. Both riot and conspiracy require the conduct of more than one person. Both riot and conspiracy require the participants to be engaging in the forbidden conduct. The essence of both riot and conspiracy is an unlawful combination, and its common purpose. Accordingly, we look to the Maryland law of conspiracy for guidance.

In *State v. Buchanan,* 5 H. & J. 317, 355 (1821), the Court of Appeals restated the common-law definition and defined an unlawful assembly as "the assembling of three or more together to do an unlawful act . . . ." This definition was expanded by the language of *Cohen,* which defines unlawful assembly as requiring the existence of circumstances evidencing a present threat of violence or breach of public order.

■■ "From the beginning, it has been indisputably established that at common law a misdemeanor consists of two

---

4. No rights to lawful assembly under the First Amendment were presented. In any event, true threats are not protected by the First Amendment. *United States v. Whiffen,* 121 F.3d 18, 22 (1st Cir.1997) (citing *United States v. Fulmer,* 108 F.3d 1486, 1492–93 (1st Cir.1997)); accord *United States v. Orozco–Santillan,* 903 F.2d 1262, 1265 (9th Cir.1990).

elements: 1) the *mens rea* of intending to commit a particular crime and 2) the *actus reus* of taking a substantial step, beyond mere preparation, toward the commission of the targeted crime." *Dabney v. State,* 159 Md.App. 225, 234–35, 858 A.2d 1084 (2004). The *actus reus* of riot is the second element of the crime, *i.e.,* an agreement, not simply to carry out a common purpose, but to carry out a common purpose in such violent or turbulent manner as to terrify others. *See Hudson v. State,* 152 Md.App. 488, 515, 832 A.2d 834 (2003); and *Cohen, supra.* As stated in *Buchanan,* "it is not the bare unexecuted intention which the law punishes, but it is the act of meeting, connected with the object of that meeting, which constitutes the offence . . . ." *Buchanan,* 5 H. & J. at 355. With respect to the *actus reus,* it is sufficient that the participants perform acts that in some way are directed to the furtherance of the acts which constitute the riot.

▪ Nevertheless, the common purpose of the unlawful assembly in a riot may or may not be a substantive crime, unlike conspiracy, which is distinct from the substantive crime contemplated by the conspiracy and which may be charged as a separate offense. Although the assembly may not have been initially unlawful, it can become so by the participants' engaging in a common cause, to be accomplished with violence and a tumultuous manner. Thus, the common intent to do wrong may be formed either before or at any time during the assembly, and an assemblage lawful in its inception may become unlawful if the group conceives an unlawful purpose, which it proceeds to carry out in a violent or turbulent manner. *See Cohen,* 173 Md. at 228, 195 A. 532. In *Cohen,* the defendant was convicted of inciting to riot and riot. The Court observed that "[t]he organization had a right to strike and to unionize the employees of the cab company, but, to accomplish this purpose, its officers and members had no right to resort to violence, disturbance of the public peace, or create a reign of terror."

In *Briscoe v. State,* 3 Md.App. 462, 467–68, 240 A.2d 109 (1968), this Court stated:

[A] mutual intent to assist one another against any who shall oppose them is an element of the offense of riot, but it seems that, while this specific intention may be held by rioters, it is not in general essential to the offense and a previous agreement or conspiracy need not be shown. The intention which is generally an element of the offense is the intent to join in or encourage the acts which constitute the riot.

*Id.* (quoting 77 C.J.S. *Riot* § 6, at 426) (internal quotations omitted). *See also,* 4 Charles E. Torcia, *Wharton's Criminal Law,* § 544 (15th ed.1996).

■ As a practical matter, direct evidence is rarely available to prove the common purpose. As is the case in conspiracies, a formal written agreement is not necessary, and it is not even necessary to prove the terms of any particular agreement or plan. A common purpose may be inferred from the acts and conduct of the individuals.

■ In the case at hand, after Brandon replied to the appellant that he did not take his cell phone, appellant pushed or punched him. At that point, the group that was with appellant converged around Brandon, who was being restrained from behind, and one of the group stabbed him in the chest. Based on this aggressive behavior of appellant and his group, *all of whom were functioning as a continuing unit through the evening,* together with their persistent attempts throughout the party to instigate fights with other partygoers, the jury could infer that the group shared a common purpose.

Further, based on the testimony that Davis was in possession of appellant's cell phone after the altercation between appellant and Brandon, an inference can be drawn that Davis had been in possession of the phone at the time appellant, making no use of reason, but employing passion, instigated a fight with Brandon that ultimately resulted in Brandon being stabbed to death.

■ Each person engaged in the commission of the criminal act bears legal responsibility for all consequences that naturally and necessarily flow from the act of each and every

participant. *Veney v. State,* 251 Md. 159, 174, 246 A.2d 608 (1968). Riot, like conspiracy, can be envisioned as an *ad hoc* agency relationship between the participants, so what one does or says may be considered to be the execution of the common purpose. Thus, all those who knowingly participate in, and directly and substantially contribute to, the realization of the common purpose may be held criminally responsible for resulting criminal conduct.

Similar to a participant in a conspiracy, a person engaged in the commission of a riot may be responsible for all of the aftermath that may naturally emanate from it, and if he joins with others to achieve an illegal purpose, he may be liable for the acts of each and all who participate with him. If they all act in concert for a common object, each is the agent for all the others, and the acts done are the acts of each and all. A participant may be part of a riot even without having any knowledge of what the other rioters are doing at any time. One rioter may not necessarily be doing the same thing as the other rioters at the same time. What is important is that they all intend to contribute to the common purpose. As *Cohen* observed, "Many of the exceptions were taken to evidence of disturbances at which the defendant was not present as an active participant, or were not shown to be directly incited by him. There was no effort to conceal the fact that he was directing the strike, present at all conferences, making speeches before and after every outbreak and disturbance . . . ." *Cohen,* 173 Md. at 227, 195 A. 532. As in conspiracy, if a participant's act in the riot was pursuant to a common purpose, he is equally liable at law with all the other participants, irrespective of the greater or lesser degree of his role. *Id.; see also Grandison v. State,* 305 Md. 685, 689, 506 A.2d 580, *cert. denied,* 479 U.S. 873, 107 S.Ct. 38, 93 L.Ed.2d 174 (1986).

c.

*A Violent or Turbulent Manner as to Terrify Others*

Finally, as to the requirement that the common purpose be carried out in a violent or turbulent manner as to

terrify others, there was evidence that a "shank" or knife had been brought to the party. The victim was held in a choke hold by one of appellant's group, which constituted a battery. In addition, the group at least was engaging in disorderly conduct under Md.Code (2002), section 10–201 of the Criminal Law Article, by engaging in offensive and disturbing conduct. *See generally, Eanes v. State,* 318 Md. 436, 451–54, 569 A.2d 604 (1990); *In re Nawrocki,* 15 Md.App. 252, 258, 289 A.2d 846 (1972). The evidence gives rational persons in the neighborhood of the assembly well-grounded fear of breach of peace by the appellant and his group, who were behaving in a violent or turbulent manner so as to terrify others.

In our viewing of the evidence as a whole, and not weeding out the component parts in order to inquire separately into them microscopically, we conclude it was sufficient to permit a jury to find appellant guilty of common-law riot.

4.

*Sentence Imposed*

■ Appellant next contends that the ten-year sentence for common-law riot violates the constitutional prohibition against cruel and unusual punishment. This argument is without merit.

> In the case of common law crimes, the only restrictions on sentence are that it be within the reasonable discretion of the trial judge and not cruel and unusual punishment. In the imposition of sentence, the court must not only consider the accused, but in cases of serious import, the example to others of like inclination.

*Lynch v. State,* 2 Md.App. 546, 564, 236 A.2d 45 (1967).

■ In a criminal proceeding, a sentencing judge is "vested with virtually boundless discretion." *Logan v. State,* 289 Md. 460, 480, 425 A.2d 632 (1981). But, the judge must not be motivated by ill will, prejudice, or other impermissible considerations, and the sentence must be within the statutory limitations. *See Reid v. State,* 302 Md. 811, 820, 490 A.2d 1289 (1985) (citing *Teasley v. State,* 298 Md. 364, 370, 470 A.2d 337

(1984)). The reason the sentencing judge "is accorded this broad latitude [is] to best accomplish the objectives of sentencing—punishment, deterrence and rehabilitation." *State v. Dopkowski*, 325 Md. 671, 679, 602 A.2d 1185 (1992) (citing *Johnson v. State*, 274 Md. 536, 540, 336 A.2d 113 (1975)). Such broad discretion in making a determination of an appropriate sentence permits the trial judge to consider the facts and circumstances surrounding a charge of which the defendant was acquitted. *Henry v. State*, 273 Md. 131, 147–48, 328 A.2d 293 (1974).

Appellant argues that the imposition of a ten-year sentence on a conviction for common-law riot was unconstitutionally disproportionate to the crime and, thus, violative of the Eighth Amendment's prohibition against cruel and unusual punishment. We disagree.

In *State v. Stewart*, 368 Md. 26, 791 A.2d 143 (2002), the Court of Appeals stated that, " '[i]n order to be unconstitutional, a punishment must be more than very harsh; it must be *grossly* disproportionate. This standard will not be easily met.' " *Id.* at 33, 791 A.2d 143 (quoting *Thomas v. State*, 333 Md. 84, 95, 634 A.2d 1 (1993)). Furthermore, "challenges based on proportionality will be seriously entertained only where the punishment is truly egregious." *Thomas*, 333 Md. at 97, 634 A.2d 1. Because "the sentencing judge is 'virtually always better informed of the particular circumstances,' " a reviewing court considering a proportionality challenge "should look to the seriousness of the conduct involved ... [and] any articulated purpose supporting the sentence." *Id.* at 95 and 97, 634 A.2d 1.

In the present case, the court, prior to imposing sentence, clearly articulated its rationale for imposing a sentence above the guidelines of three to eight years when it stated:

It is ... clear that the [appellant's] hostility at the party was clearly the spark that ignited the fight, which led to the death of Brandon Malstrom. After being asked to leave, [appellant] chose [not] to do so, and instead, continued [his]

turbulent and aggressive behavior until the party ended, which eventually carried over into the streets where the physical confrontation took place. The overt threatening and belligerent behavior led up to the stabbing of Brandon Malstrom.

The jury failed to convict either [appellant or Quan Davis] of Brandon's murder; however, it is this Member of the Bench's opinion that it was clear to the Jury that if it wasn't for this turbulent behavior demonstrated throughout the party, this very fine young man might still be with us today. The Court has exceeded the guidelines ... as to [appellant]. The basis for which the Court exceeded the guidelines is for the reasons that I had stated previously: that the particular reason is that the level of harm was excessive, and the Court believes that the [appellant's] behavior set into motion the death of a twenty-year-old college student.

The penalty paid for acts of foolishness is that someone else always suffers for them. Although the sentence is above the guidelines, the court clearly articulated the reason for the sentence and was well within its discretion in imposing a ten-year sentence on appellant.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.